OMEGA ENGINEERING, INC., Plaintiff,

v.

EASTMAN KODAK COMPANY,
Defendant.

Civ. No. 5:90CV00554 (PCD).

United States District Court,
D. Connecticut.

Dec. 1, 1995.

Joseph L. Clasen, David J. Burke, Robinson & Cole, Stamford, CT, Daniel J. Kelly, Robert · A. Trevisani, William A. Zucker, Leigh A. Gilligan, Gadsby & Hannah, Boston, MA, James R. Fogarty, Epstein Fogarty Cohen & Selby, Greenwich, CT, W. James Cousins, McGowan & Cousins, Stamford, CT, for Omega Engineering, Inc.

Benjamin A. Solnit, George E. O'Brien, Jr., Christopher P. McCormack, Christine D. Marsching, Tyler, Cooper & Alcorn, New Haven, CT, Harold A. Kurland, Nixon, Hargrave, Devans & Doyle, Rochester, NY, Richard F. Orr, Office of the Speaker, Hartford, CT, for Eastman Kodak Co. and Ultra Technologies, Inc.

David E. Rosengren, Pepe & Hazard, Hartford, CT, for MIT Dev. Corp.

Chase T. Rogers, Cummings & Lockwood, Stamford, CT, for Price Waterhouse.

## MEMORANDUM AND RULING ON MOTION FOR SUMMARY JUDGMENT

DORSEY, Chief Judge.

Defendant has filed a motion for summary judgment dated September 13, 1993, pertaining to counts I–VII and IX of the complaint.[1] For the reasons below, the motion is granted in part and denied in part.

### I. BACKGROUND

From 1987 to 1990, plaintiff Omega Engineering, Inc. ("Omega") purchased 9–volt lithium batteries with the brand name "Ultralife" from defendant Eastman Kodak Company ("Kodak") for inclusion with Omega's battery-powered products. In 1990, Kodak stopped manufacturing the Ultralife. Omega asserts several claims relating to the batteries' price, quality, safety, and discontinued production.

### II. DISCUSSION[2]

■ Summary judgment avoids the delay and expense of trying claims for which a legally meritorious, factually indisputable defense exists. *See Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). Summary judgment is proper if the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

---

1. The September 13, 1993 motion and supporting memoranda refer to the counts as contained in the Second Amended Complaint. (*See, e.g.,* Mem. of L. in Supp. of Def.'s Mot. for Summ.J. (Sept. 13, 1993) at 28 (referring to Count VIII as based not on the Lanham Act, 15 U.S.C. § 1125(a) (1988), but rather on the Connecticut Unfair Trade Practices Act ("CUTPA"), CONN.GEN. STAT. §§ 42–110a–42–110q (1993)).) The Second Amended Complaint was superseded by the Third Amended Complaint approximately eighteen months after the September 13, 1993 motion was filed. The Third Amended Complaint differs from its predecessor only by the addition of a claim based on the Lanham Act as Count VIII. Given such a discrete and easily discernible difference between the two complaints, the September 13, 1993 motion will be construed to apply to the Third Amended Complaint.

2. The following discussion relies repeatedly on the Uniform Commercial Code ("UCC") and cases construing it. The UCC governs the sale of goods, including the Ultralife transactions. *See* U.C.C. §§ 42a–2–105(1) (definition of "goods"), 2–106(1) (definition of "sale") (1977).

The UCC appears in Title 42a of the Connecticut General Statutes. *See* CONN.GEN.STAT. § 42a–1–101 (1993) ("This title shall be known and may be cited as Uniform Commercial Code.") That statutory provision retains the UCC section numbers, preceded by the prefix "42A" for the title in which they appear. *Compare* U.C.C. §§ 1–101–10–109 *with* CONN.GEN.STAT. §§ 42a–1–101–42A–10–109. Citations herein will generally be to the Connecticut General Statutes rather than to the equivalent UCC provisions on which much of the cited authority relies, except that comments will be cited according to the UCC section to which they pertain.

■ The initial burden is on the moving party to demonstrate the nonexistence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). This burden may be discharged by pointing out the absence of evidence to support the nonmoving party's case. *Id.* at 325, 106 S.Ct. at 2554.

■ "When the moving party has carried its burden ... its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio. Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The adverse party may not rest upon "mere allegations or denials," Fed.R.Civ.P. 56(e), but "must set forth specific facts showing that there is a genuine issue for trial." *Id.; see also JSP Agency, Inc. v. Am. Sugar Refining Co.,* 752 F.2d 56, 59 (2d Cir.1985) ("Concrete particulars must be set forth in opposition to the motion.").

■ To defeat a properly supported motion for summary judgment, a factual issue must be both "genuine" and "material." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). A factual issue is not "genuine" unless "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. at 2510. A factual issue is not "material" unless it "might affect the outcome of the suit under the governing law." *Id.* In deciding whether there is a genuine issue of material fact, the court must draw all reasonable inferences in favor of the nonmoving party. *Id.* at 255, 106 S.Ct. at 2513–14.

### A. Statute of Frauds

Count I alleges that Kodak breached a requirements contract to supply Omega with Ultralife batteries at a specified price. (*See* Third Am.Compl. (Jan. 13, 1995) ¶ 31.) This alleged contract is unenforceable, however, for failure to satisfy the statute of frauds.

■ The statute of frauds applies to contracts for the sale of goods for the price of $500 or more. *See* Conn.Gen.Stat. § 42a–2–201(1) (1993). The alleged contract is subject to the statute of frauds because, had it been carried out, the value of goods sold would have exceeded $500.[3] *See* 3 Samuel Williston, A Treatise on the Law of Contracts § 523, at 686–87 (Walter H.E. Jaeger ed., 3d ed. 1960) ("[W]here the contract is ... to sell a quantity of goods as yet undetermined at a [total] price to be fixed by the number ... of the goods [ultimately sold] ... the value of [the] goods [for purposes of the statute of frauds] ... depends on ... what the [total] amount or value of the goods would have been if the contract had been carried out....").

■ A contract subject to the statute of frauds generally is enforceable only if "there is some writing sufficient to indicate that a contract ... has been made ... and signed by the party against whom enforcement is sought...." Conn.Gen.Stat. § 42a–2–201(1). The writing must specify the quantity of goods to be sold. U.C.C. § 2–201 cmt. 1 (1977) ("The only term which must appear is the quantity term...."). For a requirements contract, the quantity to be specified is "a party's requirements." *Eastern Dental Corp. v. Isaac Masel Co.,* 502 F.Supp. 1354, 1364 (E.D.Pa.1980).

No writing that might bind Kodak contains such a quantity term. Neither Omega's purchase orders nor Kodak's letters state that Kodak would supply Omega's Ultralife requirements for the indefinite future. Each purchase order calls for specific quantities of batteries on specific dates. (*See* App. to Def.'s Mot. for Summ.J. (Sept. 13, 1993) Exs. 1–11.) Each letter discusses these sales, and one "look[s] forward to a long term business relationship" based upon them. (*See id.* Ex. 21; *see also id.* Exs. 20, 22.) These writings suggest a series of separate, finite transactions—not an overall requirements contract of indefinite duration.

---

**3.** It is obvious that, had performance continued, the value of goods exchanged would have exceeded $500 because, when Kodak ceased performance, the value of goods exchanged already exceeded $500. (*See* Mem. of L. in Supp. of

Def.'s Mot. for Summ.J. (Sept. 13, 1993) at 3 ("Omega took delivery of approximately 90,000 Ultralife batteries ... and paid first $1.98, then $2.20, and then $2.09 per battery.").)

Omega cannot cure the lack of a written, requirements-related quantity term by reference to parol evidence of the parties' course of dealing, such as oral statements by Paul F. Dickinson, Kodak's director of market development. (*See, e.g.,* Wakeman Aff. (Oct. 13, 1992) ¶ 15 ("Mr. Dickinson, on behalf of Kodak, stated that ... Kodak would agree to supply the Ultralife needs of Omega.").) "[W]here the writing relied upon to form the contract of sale is totally silent as to quantity, parol evidence cannot be used to supply the missing quantity term." *Alaska Indep. Fishermen's Mktg. Ass'n v. New England Fish Co.,* 15 Wash.App. 154, 548 P.2d 348, 352 (1976); *see also Ace Concrete Prods. Co. v. Charles J. Rogers Constr. Co.,* 69 Mich.App. 610, 245 N.W.2d 353, 356 (1976) ("The quantity term must appear on the confirmation without reference to parol evidence.").

Nor can Omega enforce the alleged requirements contract based on the parties' part performance thereof. UCC § 2–201(3)(c) merely permits a contract that does not satisfy the statute of frauds to be enforced "with respect to goods for which payment has been made and accepted or which have been received and accepted...." CONN.GEN.STAT. § 42a–2–201(3)(c); *see also Manheimer v. Matzdorff,* 28 U.C.C.Rep. 325, 327, 1980 WL 98445 (Conn.Super.1980) ("[P]artial payment satisfies the statute [of frauds] only as to that portion for which payment has been made and accepted."). The section does not permit enforcement of such a contract beyond what has already been performed. *See Lippold v. Beanblossom,* 23 Ill.App.3d 595, 319 N.E.2d 548, 549 (1974) ("[P]artial performance does not support a cause of action for anything over that already performed."); *Artman v. Int'l Harvester Co.,* 355 F.Supp. 482, 485 (W.D.Pa. 1973) (Although affording buyers a remedy for goods accepted and paid for, section 2–201(3)(c) "does not indicate in any way that a delivery of goods shall [bind] two parties to a complex on-going franchise relationship."). Therefore, because the alleged requirements contract is unenforceable under the statute of frauds, Kodak is granted summary judgment on Omega's breach of contract claim in Count I.

### B. Good Faith and Fair Dealing

Count II alleges Kodak breached its duty of good faith and fair dealing in conducting business with Omega. (*See* Third Am.Compl. (Jan. 13, 1995) ¶ 42.) Good faith and fair dealing are not independent requirements; instead, they arise from, and are dependent upon, the existence of an enforceable contract. *See Cimino v. FirsTier Bank,* 247 Neb. 797, 530 N.W.2d 606, 616 (1995) ("[I]n order for the implied covenant of good faith and fair dealing to apply, there must be in existence a legally enforceable contractual agreement."); *see also Verrastro v. Middlesex Ins. Co.,* 207 Conn. 179, 190, 540 A.2d 693, 699 (1988) ("The concept of good faith and fair dealing is 'essentially ... a rule of construction....'" of existing contracts.) (quoting *Magnan v. Anaconda Indus.,* 193 Conn. 558, 567, 479 A.2d 781, 786 (1984)); *see also* CONN.GEN.STAT. § 42a–1–203 (1993) ("*Every contract or duty ... imposes* an obligation of good faith in its performance or enforcement.") (emphasis added). Omega bases its good faith and fair dealing claim on the alleged requirements contract discussed above. (*See* Third Am.Compl. (Jan. 13, 1995) ¶ 37.) Because this contract is unenforceable, it is not a basis for applying the duty of good faith and fair dealing to the Ultralife transactions. Thus, Kodak is granted summary judgment on Count II.

### C. Promissory Estoppel

Count III alleges that Kodak was bound under the doctrine of promissory estoppel to supply Omega's Ultralife requirements. (*See* Third Am.Compl. (Jan. 13, 1995) ¶¶ 45–48.) Kodak argues that its representations about supplying batteries were too ambiguous to support this claim: "A fundamental element of promissory estoppel ... is the existence of a clear and definite promise which a promisor could reasonably have expected to induce reliance." *D'Ulisse–Cupo v. Bd. of Directors of Notre Dame High Sch.,* 202 Conn. 206, 213, 520 A.2d 217, 221 (1987). Kodak alleges it made only "general expressions of business good will" and "[g]eneral statements of long-term commit-

ment to the battery market," not precise promises to supply Omega's Ultralife requirements for the indefinite future. (Mem. of L. in Supp. of Def.'s Mot. for Summ.J. (Sept. 13, 1993) at 19.)

■ There is evidence that Kodak's characterizations of its statements are incorrect or, at least, incomplete. In particular, statements attributed to Paul F. Dickinson were more promissory than Kodak suggests and were sufficient under the foregoing standard. (*See, e.g.,* Wakeman Aff. (Oct. 13, 1992) ¶ 20 ("Mr. Dickinson stated that Kodak's agreement . . . represented its commitment to supply Omega's needs for the long term."); Mangarella Aff. (Oct. 15, 1992) ¶ 6 ("Mr. Dickinson stated . . . that he personally came . . . to demonstrate Kodak's commitment to supply Omega with its Ultralife requirements.").) These statements "manifested a present intention . . . to undertake immediate contractual obligations. . . ." *D'Ulisse–Cupo,* 202 Conn. at 214–15, 520 A.2d at 221–22. They are unlike statements in cases cited by Kodak, which merely evidenced an expectation of contracting at a later date. *See id.* at 214, 520 A.2d at 221 (Defendants allegedly stated that " 'everything looked fine for [plaintiff's] rehire for the next year' . . . [and that] '[a]ll present faculty members will be offered contracts for next year.' "); *Dacourt Group, Inc. v. Babcock Indus., Inc.,* 747 F.Supp. 157, 161 (D.Conn.1990) (Defendant purportedly represented that it " 'had agreed to the Dacourt financing', and . . . 'would proceed diligently to negotiate all relevant documents. . . .' "). Dickinson's statements also distinguish this case from *Economu v. Borg–Warner Corporation,* 652 F.Supp. 1242 (D.Conn.1987), *aff'd,* 829 F.2d 311 (2d Cir. 1987), wherein there was *"no evidence* of defendants' factual representations. . . ." *Id.* at 1251 (emphasis added). Therefore, Kodak is denied summary judgment on Count III.

## D. Breach of Warranty

Count IV alleges Kodak breached an express warranty that the Ultralife had a shelf life of up to ten years. (*See* Third Am. Compl. (Jan. 13, 1995) ¶¶ 50, 55, 58.) Count V alleges that Kodak breached warranties by

supplying batteries that leaked electrolyte. (*See id.* ¶¶ 61, 62, 64.)

### 1. Lost Profits

■ Kodak argues that Omega may not, under its warranty claims, recover lost profits stemming from Ultralife defects. Lost profits are a form of "consequential damages." 1 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 10–4, at 518 (3d ed. 1988) ("The most commonly litigated and doubtless the most often sought after item of consequential damages is lost profits."). Such damages are recoverable for a seller's breach of warranty. *See, e.g., Albin Elevator Co. v. Pavlica,* 649 P.2d 187, 191 (Wyo.1982) ("[T]he general rule is that [lost] profits are a proper element of damages which can be recovered for breach of warranty under the Uniform Commercial Code."). Recovery, however, is permitted only if, at the time of contracting, the seller had reason to foresee that the buyer would probably lose profits as a result of breach of warranty. *See* CONN.GEN.STAT. § 42a–2–715(2) (1993) ("Consequential damages resulting from the seller's breach include . . . any loss resulting from . . . requirements and needs of which the seller at the time of contracting had reason to know. . . ."); *see also Bemidji Sales Barn, Inc. v. Chatfield,* 312 Minn. 11, 250 N.W.2d 185, 188 (1977) ("Lost profits, provided they are foreseeable by the seller, are clearly recoverable [for breach of warranty]. . . ."); 1 WHITE & SUMMERS, *supra,* § 10–4, at 516 (" '[T]he test is one of reasonable foreseeability of probable consequences.' ") (quoting *Gerwin v. Southeastern Cal. Ass'n of Seventh Day Adventists,* 14 Cal.App.3d 209, 92 Cal.Rptr. 111, 118 (1971)).

■ There is a genuine issue as to whether Kodak, at the time of contracting, had reason to foresee that Omega would probably lose profits if the Ultralife was defective as alleged. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (A factual issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party.") The trier of fact could properly infer that the claimed defects led to profit loss for Omega as follows: In or around February 1988, Black & Decker

stopped marketing a flashlight using the Ultralife after concluding that the battery's shelf life was shorter than Kodak had warranted. (*See* Wakeman Aff. (Oct. 13, 1992) Ex. 7 (Attach. to Letter from Dickinson to Wakeman (Feb. 12, 1988)) ("Black and Decker has advised [Kodak] that they are withdrawing a flashlight line using this battery . . . because it depended on a 10 year shelf life claim.").) In August 1988, Kodak settled Black & Decker's complaint for $5,900,000. (*See* Pl.'s Loc.R. 9(c)(2) Statem. of Mat. Factual Issues To Be Tried (Oct. 12, 1993) Ex. 29 ("Agreement and Release" (Aug. 16, 1988)).) These events caused Kodak to experiment with alternative battery designs that could be sure to live up to the Ultralife's advertised shelf life. (*See, e.g.,* Pl.'s Loc.R. 9(c)(2) Statem. of Mat. Factual Issues To Be Tried (Oct. 12, 1993) Ex. 29 ("Ultralife Performance") ("A new formulation has been developed for the Ultralife battery that solves th[e] problem [in the Black & Decker flashlights]. . . .").) One of these alternative designs contained Lectro electrolytes that leaked, ignited, and resulted in Kodak paying damages to consumers. (*See, e.g.,* Way Dep. (Sept. 30, 1992) at 170, 174 (leakage and ignition); Clark Dep. (Sept. 29, 1992) at 532–33 (damage payments).) The loss of Black & Decker's business, the multi-million-dollar size of the August 1988 settlement, and the electrolyte damage payments all contributed to the Ultralife's unprofitability and ultimate withdrawal from the market.[4] This withdrawal cost Omega profits from sales that would have occurred had Ultralife production continued. (*See* French Aff. (Oct. 15, 1992) ¶ 13.[5])

Kodak cites no evidence to support its claim that a chain of events connecting Ultralife defects to Omega profit loss was not reasonably foreseeable at the time the alleged warranties were made. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of . . . identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact."); *see also id.* at 325, 106 S.Ct. at 2554 ("[T]he burden on the moving party may be discharged by . . . pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case."). Nor is Kodak persuasive that its withdrawal of the Ultralife is unsusceptible to warranty analysis. Kodak is correct that warranty principles apply only to delivered goods and create no obligation for a seller to continue supply. *See* 1 WHITE & SUMMERS, *supra*, § 10–1, at 501 ("We believe that only buyers who have accepted [goods] . . . can use [UCC § ]2–714."); *see also* CONN.GEN.STAT. § 42A–2–714(2) (damages for breach of warranty). The Ultralife's discontinued production, however, is not a breach of warranty claimed by Omega. The breaches alleged are for the shelf life and leakage of Ultralifes that were delivered. (*See* Third Am.Compl. (Jan. 13, 1995) ¶¶ 55 (shelf life),

4. The evidence cited above demonstrates the fallacy of Kodak's assertion that "[t]here is no genuine dispute that Kodak discontinued the Ultralife because of poor financial performance, not defects." (Mem. of L. in Supp. of Def.'s Mot. for Summ.J. (Sept. 13, 1993) at 22.) The Ultralife's defects may have contributed to its poor financial performance, so that drawing a distinction between the two may be artificial.

5. Kodak is incorrect that the testimony of Dr. Gary L. French, Omega's expert on profit loss, is lacking in scientific validity and probative value. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, —— U.S. ——, 113 S.Ct. 2786, 2795–98, 125 L.Ed.2d 469 (1993) (trial court's analysis of purportedly scientific testimony under Federal Rules of 'Evidence); *see also id.* at ——, 113 S.Ct. at 2798 ("[I]n the event the trial court concludes that the scintilla of evidence presented supporting a [purportedly scientific] position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free . . . to grant summary judgment. . . ."). It does not matter if, as Kodak apparently argues, French's assertions about defects encountered by Omega customers are supported by no direct evidence other than inadmissible hearsay. (*See* French Aff. (Oct. 15, 1992) ¶ 12–13; *see also* Def.'s Reply Mem. in Supp. of Its Mot. for Summ.J. (Oct. 27, 1993) at 7–9.) There is sufficient *indirect* evidence from which the trier of fact could reasonably infer that Omega customers faced the same problems as Black & Decker, the consumers compensated for Lectro ignition, and other Ultralife consumers. (*See, e.g.,* Dickinson Dep. (Oct. 3, 1991) at 58–59 (Ultralife batteries containing Lectro electrolyte were manufactured for Original Equipment Manager ("OEM") customers such as Omega from early 1988 to summer 1989).)

61–62 (leakage).) Kodak's withdrawal from the lithium battery business, like Omega's profit loss, is properly understood as a reasonably foreseeable consequence of the breaches alleged.[6]

### 2. Damages Other Than Lost Profits

Other than lost profits, Kodak discusses only two types of damages for breach of warranty: (1) replacement of defective batteries or refund of the purchase price,[7] and (2) repair or replacement of products damaged by defective batteries.[8] Kodak is willing to stipulate to a judgment for such damages, which, it alleges, are the only ones Omega is entitled to for breach of warranty.

 Omega, however, may recover at least one type of damages not mentioned by Kodak. A buyer may be entitled to incidental damages for a seller's breach of warranty. *See* Conn.Gen.Stat. § 42a–2–715(1) ("Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach."); *see also Consolidated Data Terminals v. Applied Digital Data Sys., Inc.*, 708 F.2d 385, 394 (9th Cir.1983) (buyer was permitted to recover as incidental damages all reasonable expenses incurred in inspecting, shipping, handling, and storing computers that did not conform with express warranty). Omega claims such damages, (*see* Third Am.Compl. (Jan. 13, 1995) at 33, ¶ 1(b)), and Kodak has not at-

tempted to demonstrate the nonexistence of a genuine issue as to Omega's entitlement thereto. *See Celotex Corp., supra.* Therefore, Kodak is incorrect that Omega's damages for breach of warranty may not include lost profits and are otherwise limited to the two categories enumerated above.

### E. Fraud

Count VI claims fraud. (*See* Third Am. Compl. (Jan. 13, 1995) ¶¶ 70–74.) Kodak allegedly misrepresented its intentions to supply Omega's Ultralife needs, (*see id.* ¶ 70), and the battery's shelf life, (*see id.* ¶ 73). Kodak also allegedly failed to disclose that it planned to exit the 9–volt lithium battery business, (*see id.* ¶ 72), and that the Ultralife leaked electrolyte, (*see id.* ¶ 74).

#### 1. Knowledge or Recklessness as to Statements' Falsity

Kodak argues that there is no evidence of a *scienter* element of fraud: "The record provides no basis for concluding that any of the alleged misrepresentations were known to be false when made. Nor is there any evidence that the representations were made recklessly." (Mem. of L. In Supp. of Def.'s Mot. for Summ.J. (Sept. 13, 1993) at 24.) This argument raises immaterial factual issues. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (A factual issue is not "material" unless it "might affect the outcome of the suit under the governing law.").

 Omega's nondisclosure claims do not require proof that Kodak made false statements knowingly or recklessly. Al-

---

**6.** There is no merit to Kodak's assertion that Omega's claims of damages from Ultralife defects and withdrawal are logically inconsistent. (*See* Mem. of L. in Supp. of Def.'s Mot. for Summ.J. (Sept. 13, 1993) at 22 n. 13 ("If the battery was so defective that it damaged Omega's reputation and good will, its withdrawal from the market should have reduced Omega's losses, not increased them.").) It is perfectly conceivable that defects damaged Omega's reputation with its customers who used the Ultralife, and that withdrawal damaged Omega's reputation with other customers who did not yet possess the battery but wanted to.

**7.** Such substitution or refund for defective batteries returned to Kodak would give Omega the

benefit of its bargain, as under UCC § 2–714(2). *See* Conn.Gen.Stat. § 42a–2–714(2) ("The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted. . . .); *see also* 1 White & Summers, *supra*, § 10–2, at 503 (explaining how "[s]ection 2–714 . . . award[s] the buyer the benefit of a good bargain").

**8.** Such repair or replacement of damaged products would accord with UCC § 2–715(2). *See* Conn.Gen.Stat. § 42a–2–715(2) ("Consequential damages resulting from the seller's breach include . . . injury to . . . property proximately resulting from any breach of warranty.").

though fraudulent misrepresentation involves such proof, *see, e.g., Miller v. Appleby*, 183 Conn. 51, 54–55, 438 A.2d 811, 813 (1981) (Fraudulent misrepresentation involves a "false representation ... known to be untrue by the party making it...."); *Sallies v. Johnson*, 85 Conn. 77, 82, 81 A. 974, 976 (1911) ("A fraudulent representation ... is one that is ... recklessly made...."), *overruled on other grounds, Kilduff v. Adams, Inc.*, 219 Conn. 314, 593 A.2d 478 (1991), fraudulent nondisclosure involves not a statement, but silence. *See, e.g., Egan v. Hudson Nut Prods., Inc.*, 142 Conn. 344, 347, 114 A.2d 213, 214 (1955) (drawing distinction between "fraud in a person's silence" and "fraud ... in a false statement"). Not surprisingly, the *scienter* requirement for fraudulent nondisclosure omits any reference to knowledge or recklessness as to a statement's falsity: "[T]he nondisclosure must be by a person intending or expecting thereby to cause a mistake by another to exist or to continue, in order to induce the latter to enter into or refrain from entering into a transaction." *Id.* at 347–48, 114 A.2d at 215; *see also Gelinas v. Gelinas*, 10 Conn.App. 167, 173, 522 A.2d 295, 298 (1987) ("Fraud by nondisclosure ... expands on the ... elements [of fraud by misrepresentation]...."), *cert. denied*, 204 Conn. 802, 525 A.2d 965 (1987).

 Likewise, Omega's misrepresentation claims do not require proof that Kodak made false statements knowingly or recklessly. "An innocent misrepresentation may be actionable if the declarant ... has the duty of knowing the truth." *Richard v. A. Waldman & Sons, Inc.*, 155 Conn. 343, 346, 232

A.2d 307, 309 (1967). A duty of knowing the truth exists if the declarant has "special means of knowledge." *Gen. Fin. Corp. v. Keystone Credit Corp.*, 50 F.2d 872, 878 (4th Cir.1931), *aff'd sub nom. Adams v. Keystone Credit Corp.*, 284 U.S. 684, 52 S.Ct. 201, 76 L.Ed. 578 (1932); *see also* 2 FOWLER V. HARPER ET AL., THE LAW OF TORTS § 7.7, at 421 (2d ed. 1986) ("A possible basis [for making a defendant liable for innocent misrepresentation] is ... the plaintiff's relative lack of access to the facts."). "[W]here a defendant has special means of knowledge, and a plaintiff can under the circumstances attribute to the former accurate knowledge of what is represented, the plaintiff need not show the actual knowledge of the falsity of the representation." *Miller*, 183 Conn. at 56, 438 A.2d at 813.

 As developer and manufacturer of the Ultralife, Kodak had a duty to know the truth of its representations about the battery's shelf life. *See Richard*, 155 Conn. at 346–47, 232 A.2d at 309 (Representation about a house's location on a lot "was a statement of fact about which the defendant, as a developer of residential real estate, had a special means of knowledge, and it was a matter peculiarly relating to its business...."). As Kodak's director of market development, Paul F. Dickinson had a duty to know the truth of his representations to Ultralife customers about future sales of the battery. *See Gen. Fin. Corp., supra* (company's vice president had a duty to know the truth of his representations to prospective stockholders about the company's financial condition). Therefore, Kodak is presumed[9] to have had the requisite mental state as to

---

9. The doctrine that relieves plaintiffs such as Omega from the burden of proving "actual knowledge," *Miller*, 183 Conn. at 56, 438 A.2d at 813, appears to be an exception to the rule that "[f]raud is not to be presumed but must be proven by clear and satisfactory evidence." *Id.* at 55, 438 A.2d at 813. By saying there is no need for proof of "actual knowledge," *id.* at 56, 438 A.2d at 813, the Connecticut Supreme Court clearly does not mean that knowledge can be inferred from circumstance. *See Puro v. Henry*, 188 Conn. 301, 310, 449 A.2d 176, 180 (1982) ("The general rule that fraud is not presumed ... does not [disallow] ... circumstantial evidence...."). Although a duty to know the truth is imputed from "special means of knowledge,"

see *Gen.Fin.Corp., supra*, such "special means" are not "circumstantial evidence ... [from which] rational minds could reasonably and logically draw [an] inference." *Puro, supra* (quoting *Console v. Nickou*, 156 Conn. 268, 275, 240 A.2d 895, 898 (1968). Rather, a finding of "special means of knowledge" is a conclusion of law that presumes an innocent misrepresentation to be otherwise and obviates the need for any showing of knowledge or recklessness. *See Richard*, 155 Conn. at 346–47, 232 A.2d at 309–10 (court finding of "special means of knowledge" and no consideration of recklessness or circumstantial proof of knowledge); *Miller*, 183 Conn. at 56, 438 A.2d at 813 (same).

the representations' falsity.[10] *See Clark v. Haggard,* 141 Conn. 668, 672, 109 A.2d 358, 361 (1954) [11] (" 'In matters susceptible of actual knowledge, if the party who has and is known to have the best means of knowledge, makes an affirmation contrary to the truth, in order to secure some benefit to himself, the law treats him as stating that he knows that whereof he affirms, and so as guilty of a fraud, although he spoke in ignorance of the facts; because he asserts that he knows what he does not know.' ") (quoting *Scholfield Gear & Pulley Co. Scholfield,* 71 Conn. 1, 19, 40 A. 1046, 1051 (1898)).

### 2. Damages from, and Disclosure of, Ultralife Defects

Kodak argues that there is no evidence of damages from hazardous substances in the Ultralife or from the battery's potential for fire and explosion. "[P]ecuniary loss is an essential element of a fraud action...." *Jourdain v. Dineen,* 527 A.2d 1304, 1307 (Me.1987) (attorney's concealment of the true status of his client's case); *see also Miller,* 183 Conn. at 54–55, 438 A.2d at 813 ("[An] essential element[ ] of an action in fraud ... [is that] ... the other party ... acted on [the fraud] to his injury."). Despite Kodak's contention, the affidavit of Dr. Gary L. French, Omega's expert on profit loss, provides evidence of pecuniary damage that is sufficiently "clear and satisfactory" to prove fraud.[12] *Miller,* 183 Conn. at 55, 438 A.2d at 813; *see also Puro,* 188 Conn. at 310, 449 A.2d at 180 ("The general rule that fraud

is not presumed ... does not [disallow] ... circumstantial evidence....").

Kodak also claims that it disclosed the Ultralife's potential for fire and explosion in an April 1989 letter to Omega. (*See* App. to Def.'s Mot. for Summ.J. (Sept. 13, 1993) Ex. 18.) This letter, however, referred to "overheating and failure," (*id.*), not to fire and explosion, (*see* Clark Dep. (Sept. 29, 1992) at 531). Thus, there is a genuine issue as to whether the letter disclosed matters as fully as it should have. *See Franchey v. Hannes,* 152 Conn. 372, 379, 207 A.2d 268, 271 (1965) (A party "must make a full and fair disclosure as to the matters about which he assumes to speak."); *see also* RESTATEMENT (SECOND) OF TORTS § 551 cmt. g (1977) ("A statement that is partial or incomplete may be a misrepresentation because it is misleading, when it purports to tell the whole truth and does not."); *see also Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510 (A factual issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

### 3. Statements about Future Battery Business

Kodak insists that its statements about conducting future battery business with Omega "cannot be considered promissory." (Mem. of L. in Supp. of Def.'s Mot. for Summ.J. (Sept. 13, 1993) at 25.) "A false representation of ... intention to do ... a particular thing is actionable if the statement is reasonably to be interpreted as expressing

---

**10.** This is not to say that either the statements or their falsity are presumed as well. To prevail at trial, Omega must still prove these and other remaining elements of fraud: "(1) that a ... representation was made as a statement of fact; (2) that it was untrue ...; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury." *Miller,* 183 Conn. at 54–55, 438 A.2d at 813. These elements cannot be satisfied without "clear and satisfactory evidence." *Id.* at 55, 438 A.2d at 813.

**11.** Kodak argues that this case is inapposite for the following reason: "*Clark* involved the obligation of a seller of land not to make intentional or reckless misrepresentations about his land to induce a sale." (Mem. of L. in Supp. of Def.'s Mot. for Summ.J. (Sept. 13, 1993) at 24 n. 14.) The terseness of this argument makes its mean-

ing unclear. If the objection is that *Clark* involved the sale of land rather than (as here) the sale of goods, Kodak should note that similar principles have been applied to sales of goods. *See, e.g., Mayfield Motor Co. v. Parker,* 222 Miss. 152, 75 So.2d 435, 437 (1954) (sale of automobile). If the argument is that *Clark* sounded in contract rather than (as here) in tort, Kodak should note the following observation about the principles relied upon above: "It is immaterial whether the wrong which can be legally inferred from the facts arises in contract or tort." *Richard,* 155 Conn. at 347, 232 A.2d at 310. Finally, if the contention is that *Clark* does not eliminate the need for a showing of knowledge or recklessness, Kodak should consider the discussion in note 9, *supra.*

**12.** See *supra* note 5.

a firm intention...." RESTATEMENT (SECOND) OF TORTS § 530 cmt. a. "[T]he recipient of the statement must be justified in his expectation that the intention will be carried out." *Id.* § 544 cmt. c. " 'Wishes' or 'desires' are not [sufficient] manifestations of future intent...." *Economu v. Borg–Warner Corp.*, 652 F.Supp. 1242, 1251 (D.Conn. 1987), *aff'd*, 829 F.2d 311 (2d Cir.1987).

 This standard is roughly analogous to the requirement for promissory estoppel of "a clear and definite promise which a promisor could reasonably have expected to induce reliance." *D'Ulisse–Cupo v. Bd. of Directors of Notre Dame High Sch.*, 202 Conn. 206, 213, 520 A.2d 217, 221 (1987).[13] There is evidence that Kodak's statements about supplying Omega's Ultralife needs were promissory under this standard,[14] and this evidence is sufficient to meet the "clear and satisfactory" proof requirement for fraud.[15] *Miller*, 183 Conn. at 55, 438 A.2d at 813. Therefore, Kodak is denied summary judgment on Count VI.

### F. Negligent Misrepresentation

 Count VII alleges that Kodak negligently misrepresented information including the Ultralife batteries' shelf life. (*See* Third Am.Compl. (Jan. 13, 1995) ¶¶ 78–81.) To prove this claim, Omega must establish that it justifiably, or reasonably, relied on the alleged misrepresentation. *Williams Ford, Inc. v. Hartford Courant Co.*, 232 Conn. 559, 579–80, 657 A.2d 212, 222 (1995) ("The plaintiff must allege and prove that the reliance on the misstatement was justified or reasonable."). "The misrepresentation must consist of a statement of a material past or present fact ... [S]tatements of opinion ... are not actionable." *McElroy v. Boise Cascade Corp.*, 632 S.W.2d 127, 130 (Tenn.App. 1982) (citations omitted). Reliance on opinions is per se unjustifiable because opinions, unlike facts, do not purport to be incontrovertible. *See Koagel v. Ryan Homes, Inc.*, 167 A.D.2d 822, 823, 562 N.Y.S.2d 312 (4th Dep't 1990) ("Defendants' projection of plaintiff future tax liability was merely an estimate and could only reasonably have been understood as such, given the volatility of tax rates and assessments. Consequently, the estimate of taxes cannot serve as the basis for claims of ... negligent ... misrepresentation....").

 Kodak insists that its representations about shelf life were statements of opinion, not fact. "The test for whether a statement is one of opinion or fact is whether 'under the circumstances surrounding the statement, the representation was intended and understood as one of fact as distin-

**13.** The only difference between the promissory estoppel and fraud standards seems to be the perspective from which reasonableness is judged. Promissory estoppel assesses reasonableness from the perspective of the promisor. *D'Ulisse–Cupo*, 202 Conn. 206, 213, 520 A.2d 217, 221 ("a clear and definite promise *which a promisor could reasonably have expected* to induce reliance") (emphasis added). Fraud assesses reasonableness from the perspective *of the promisee*. RESTATEMENT (SECOND) OF TORTS § 544 ("The recipient of a fraudulent misrepresentation of intention is justified in relying upon it *if ... the recipient has reason to believe* that it will be carried out.") (emphasis added). For present purposes, however, this difference is immaterial.

**14.** *See supra* pp. 1091–1092 (promissory estoppel).

**15.** There is also sufficient evidence that statements about supplying Omega's Ultralife needs for the indefinite future were made after Kodak allegedly decided to exit the 9–volt lithium battery business, despite Kodak's apparent assertion to the contrary: "[A]ssuming Kodak decided to exit the lithium battery business by October 1989, there is no evidence of any contrary statement ... after that time." (Mem. of L. in Supp. of Def.'s Mot. for Summ.J. (Sept. 13, 1993) at 25.) Though Kodak seemingly wishes to accept, for the sake of argument, Omega's assertion about the time that the decision to exit the battery business was made, the date Omega alleges is not "October 1989," (*id.*), but "mid–1988," (Third Am.Compl. (Jan. 13, 1995) ¶ 71 ("Kodak decided as early as mid–1988 that it was going to exit the lithium battery business.").). There is adequate evidence that promissory statements were made after the latter date, (*see, e.g.,* Wakeman Aff. (Oct. 13, 1992) ¶ 29 ("In the December 1988 meeting ... Dickinson specifically stated that Kodak would meet the supply needs of Omega....")), thereby being untruthful statements of Kodak's intention to supply Omega's Ultralife needs for the indefinite future. *See Paiva v. Vanech Heights Constr. Co.*, 159 Conn. 512, 515, 271 A.2d 69, 71 (1970) ("[A] promise to do an act in the future, when coupled with a present intent not to fulfil the promise, is a false representation.")

guished from one of opinion.'" *Woodling v. Garrett Corp.*, 813 F.2d 543, 552 (2d Cir.1987) (quoting *Crowther v. Guidone*, 183 Conn. 464, 468, 441 A.2d 11, 13 (1981)). During the Ultralife transactions, Kodak appears to have made reasonably clear that its statements about the battery's shelf life were estimates (i.e., opinions) based on product testing. With the possible exception of the first Original Equipment Manager ("OEM") brochure, (*see* App. to Def.'s Mot. for Summ.J. (Sept. 13, 1993) Ex. 15), Kodak's catalogues all contained the following disclaimer: "The curves and data in this publication represent product tested under the conditions specified. They do not represent standards or specifications which must be met by Eastman Kodak Company." (*See id.* Exs. 16, 17, 24.) Similarly, reassurances by Kodak's Paul F. Dickinson about the Ultralife's shelf life clearly referred to product research, test conditions, and performance estimates. (*See* Wakeman Aff. (Oct. 13, 1992) Ex. 8 (Dickinson "also said that nothing has changed as far as the expectation of life of the battery when used in a typical meter application. He said that only very low and very high drains create ... [a] problem."). Nevertheless, Kodak's representations about the Ultralife's shelf life must be considered statements of fact, not statements of opinion. They seem identical in nature to the estimates in *Board of Water Commissioners of the City of New London v. Robbins & Potter*, 82 Conn. 623, 74 A. 938 (1910), *overruled on other grounds, Kilduff v. Adams, Inc.*, 219 Conn. 314, 593 A.2d 478 (1991): "[T]he figures which expressed the alleged misrepresentation were furnished as estimates and approximations. But they were represented to be the result of expert engineering examination, and at least approximately accurate...." *Id.* at 635, 74 A. at 943. "Such representations are to be regarded as representations of fact, rather than of opinion." *Id.* at 634, 74 A. at 943.

Kodak further contends that reliance on the shelf life assertions was unreasonable in light of Omega's knowledge and experience: "Omega[,] ... a sophisticated manufacturer and distributor of electronic instrumentation[,] ... cannot now claim that it relied on the estimate of shelf life ... as a statement of absolute fact." (Mem. of L. in

Supp. of Def.'s Mot. for Summ.J. (Sept. 13, 1993) at 28.) Omega's status in the electronics field might make its reliance unreasonable in the context of the fraudulent misrepresentation claim. *See* W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 108, at 751 (5th ed. 1984) ("[O]ne who has special knowledge, experience and competence may not be permitted to rely on statements for which the ordinary man might recover...."). In the context of the *negligent* misrepresentation claim, however, the standard is that of the hypothetical reasonable person, irrespective of Omega's idiosyncratic qualities. *See* RESTATEMENT (SECOND) OF TORTS § 552A cmt. a (1977) ("[W]hen the misrepresentation is not fraudulent but only negligent ... the plaintiff is held to the standard of care, knowledge, intelligence and judgment of a reasonable man, even though he does not possess the qualities necessary to enable him to conform to that standard."); *see also Williams Ford, Inc.*, 232 Conn. at 576–78, 657 A.2d at 221–22 (rejection of "sophisticated commercial parties" defense to claim of negligent misrepresentation). From that perspective, Omega's reliance on the shelf life assertions does not appear unreasonable, given that Kodak's advertisements were not patently false and that Dickinson reassured Omega's concerns about their truthfulness. *Cf.* RESTATEMENT (SECOND) OF TORTS §§ 540, 541 (recipient of fraudulent misrepresentation may justifiably rely on its truthfulness, unless its falsity is known or obvious); KEETON, *supra*, § 108, at 752 n. 34 (If the plaintiff has discovered something warning him that he is being deceived, "the reliance may still be reasonable if the defendant allays the plaintiff's suspicions."). Accordingly, Kodak is denied summary judgment on Count VII's allegation of negligent misrepresentation of shelf life.

### G. Connecticut Unfair Trade Practices Act ("CUTPA")

Count IX alleges violations of the Connecticut Unfair Trade Practices Act ("CUTPA"), CONN.GEN.STAT. §§ 42–110a–42–110q (1993). (*See* Third Am.Compl. (Jan. 13, 1995) ¶¶ 90–93.) Whether a practice violates

CUTPA is determined by applying the so-called "cigarette rule":

> (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes injury to consumers [competitors or other businessmen].

*Cheshire Mortgage Serv., Inc., v. Montes*, 223 Conn. 80, 105–06, 612 A.2d 1130, 1143 (1992) (quoting *McLaughlin Ford, Inc. v. Ford Motor Co.*, 192 Conn. 558, 567–68, 473 A.2d 1185, 1191 (1984) (alterations in original)). All three criteria need not be satisfied to support a finding of unfairness. *Cheshire Mortgage Serv., Inc.*, 223 Conn. at 106, 612 A.2d at 1143. A practice may be unfair because of the degree to which it meets one of the criteria or because, to a lesser extent, it meets all three. *Id.* at 106, 612 A.2d at 1143–44.

### 1. Breach of Contract, Good Faith and Fair Dealing, Promissory Estoppel, Breach of Warranty, and Negligent Misrepresentation

 Kodak unpersuasively argues ·that a CUTPA violation is not supported by the facts underlying Omega's claims regarding breach of contract, good faith and fair dealing, promissory estoppel, breach of warranty, and negligent misrepresentation. Kodak does not identify what facts underlying the contract, warranty, and negligence claims fail to satisfy the cigarette rule. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of ... identifying those portions of [the record] ... which it believes

demonstrate the absence of a genuine issue of material fact."); *see also id.* at 325, 106 S.Ct. at 2554 ("[T]he burden on the moving party may be discharged by ... pointing out to the district court ... that there is an absence of evidence to support the nonmoving party's case."). As to the good faith and promissory estoppel claims, Kodak merely repeats alleged deficiencies under the UCC and common law, failing to recognize that CUTPA reflects a public policy in favor of remedying wrongs that may not be actionable under other bodies of law. *Cf. Associated Inv. Co. Ltd. Partnership v. Williams Assocs. IV*, 230 Conn. 148, 159, 645 A.2d 505, 510 (1994) ("[T]he private cause of action created by CUTPA reaches conduct well beyond that proscribed by any common law analogue.").

### 2. Fraud

 Kodak appears to argue that fraud is not pled in Omega's CUTPA claim with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure.[16] *See* FED.R.CIV.P. 9(b) ("In all averments of fraud ..., the circumstances constituting fraud ... shall be stated with particularity."); (*see also* Third Am.Compl. (Jan. 13, 1995) ¶ 91 ("Kodak's ... intentional ·... misrepresentations are unfair and deceptive acts and practices.").). Rule 9(b), however, does not govern the pleading of CUTPA claims. *See Fed. Paper Bd. Co. v. Amata*, 693 F.Supp. 1376, 1390 (D.Conn.1988) (Blumenfeld, Sr. J.); *see also Meredith v. Rippeto*, Conn. L.Trib., Mar. 28, 1988, at 22 (D.Conn.1987) (Eginton, J.). *But see NCC Sunday Inserts, Inc. v. World Color Press, Inc.*, 692 F.Supp. 327, 330 (S.D.N.Y.1988) ("To the extent that fraud is being alleged under the [CUTPA] rubric 'deceptive trade practices,' Rule 9(b) governs the pleading procedures.").[17] Unlike fraud, *see Miller v. Appleby*, 183 Conn. 51, 54–55, 438 A.2d 811, 813 (1981), CUTPA does not require proof that the defendant knew of

---

**16.** Although not mentioning Rule 9(b) explicitly, Kodak refers to "the elevated standards for pleading ... fraud" and cites *DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987), which applied Rule 9(b) to claims under, *inter alia*, section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1982). (*See* Mem. of L. in Supp. of Def.'s Mot. for Summ.J. (Sept. 13, 1993) at 30.)

**17.** In *Sorisio v. Lenox, Inc.*, 701 F.Supp. 950 (D.Conn.1988), *aff'd*, 863 F.2d 195 (2d Cir.1988), it was held that "[a] CUTPA claim must be pleaded with particularity to allow evaluation of the legal theory upon which the claim lies." *Id.* at 962. This conclusion has no basis in Rule 9(b), which is not concerned with revealing legal theories. *See* 5 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1297, at 590 (2d

a representation's falsity, *Web Press Servs. Corp. v. New London Motors, Inc.,* 203 Conn. 342, 362–63, 525 A.2d 57, 67–68 (1987), or intended to deceive the plaintiff, *Cheshire Mortgage Serv., Inc.,* 223 Conn. at 106, 612 A.2d at 1144. Because CUTPA claims do not necessarily allege such bad behavior, they are less serious than charges of fraud. *See Segal v. Gordon,* 467 F.2d 602, 607 (2d Cir. 1972) (" 'It is a serious matter to charge a person with fraud....' ") (quoting 1A W. BARRON & A. HOLTZOFF, FEDERAL PRACTICE AND PROCEDURE § 302, at 215–16 (Wright rev.1960)). Therefore, there is less need for a heightened pleading standard to protect against baseless allegations that might harm defendants' reputations. *See Felton v. Walston & Co.,* 508 F.2d 577, 581 (2d Cir.1974) ("[O]ne purpose of Rule 9(b) is to protect reputations ... from scurrilous and baseless allegations of fraud....").

For the same reason, there is less need under CUTPA for a clear and satisfactory standard of proof. *See Miller,* 183 Conn. at 55, 438 A.2d at 813 ("Fraud is not to be presumed but must be proven by clear and satisfactory evidence."). Fraud necessitates this elevated evidentiary standard due to the seriousness of finding a party culpable therefor. *See Kilduff v. Adams, Inc.,* 219 Conn. 314, 327 n. 14, 593 A.2d 478, 487 n. 14 (1991) (A reason "commonly cited as justification for requiring a more exacting burden of proof in fraud actions ... [is that] a person found guilty of fraudulent conduct suffers a 'stigma of guilt'....") (citation omitted); *see also Miller v. McNamara,* 15 Conn.Supp. 316, 318 (1948) (discussing heightened standard of proof and characterizing fraud as a "serious charge"), *aff'd,* 135 Conn. 489, 66 A.2d 359 (1949). Because CUTPA liability is less injurious to reputation, there is no need for the same degree of caution, and Omega's fraud allegations can establish a CUTPA violation without meeting the heightened standard of proof. Therefore, Kodak is denied summary judgment on Count IX.

### H. *Mitigation of Damages*

 Kodak argues that Omega may not recover damages for the Ultralife's unavaila-

bility after May 1991, when a similar 9–volt lithium battery—also called "Ultralife"— could have been purchased from Ultralife Batteries, Inc. ("UBI"). (*See* Clark Aff. (July 27, 1993) ¶¶ 22–26.) UCC § 2–715(2)(a) only permits recovery of consequential damages "which could not reasonably be prevented by cover or otherwise." *See* CONN.GEN.STAT. § 42a–2–715(2)(a) (1993). "Cover" involves "reasonable purchase of ... goods in substitution for those due from the seller." *Id.* § 42a–2–712(1). The substitute goods need not be identical to the original ones, but merely "commercially usable as reasonable substitutes under the circumstances of the particular case." U.C.C. § 2–712 cmt. 2 (1977).

A genuine issue exists as to whether the UBI Ultralife was a commercially reasonable substitute for the Kodak Ultralife under the circumstances of this case. Omega may have purchased the Kodak Ultralife in reliance on its maker's reputation. (*See, e.g.,* Wakeman Aff. (Oct. 13, 1992) ¶ 16 ("Omega wanted to hitch its wagon to Kodak's star.").) Omega's advertisements featured the Kodak name. (*See id.; see also id.* Ex. 14 at C–19.) Such evidence suggests that Omega's attachment to Kodak could have been more than a matter of subjective preference. "Kodak" may be a name so well-known and highly regarded by consumers that the relatively obscure "Ultralife Batteries, Inc." is not a commercially reasonable substitute in otherwise comparable products. Therefore, Kodak is denied summary judgment on the issue of mitigation of damages.

### III. CONCLUSION

Accordingly, defendant's motion for summary judgment (doc. 229–1) dated September 13, 1993 is granted as to counts I and II and denied as to counts III–VII and IX and as to the issue of mitigation of damages.

SO ORDERED.

---

ed. 1990) (elements of fraud are not the "circumstances" that Rule 9(b) requires to be pled with particularity).