**NORA BEVERAGES, INC.,**
**Plaintiff–Appellant,**

v.

**PERRIER GROUP OF AMERICA, INC.,**
**Poland Spring Corporation, Zephyrhills**
**Corporation, Arrowhead Water Corporation, and Calistoga Mineral Water Company, Inc., Defendants–Appellees.**

**Docket No. 98–7041.**

·United States Court of Appeals,
Second Circuit.

Argued Sept. 14, 1998.

Decided Dec. 30, 1998.

Martin Flumenbaum, Paul, Weiss, Rifkind, Wharton & Garrison, New York, N.Y. (Brad S. Karp, Lynn B. Bayard of Counsel; Howard G. Slavitt, Steven J. Wadyka, Jr., Slavit & Gill, P.C.) for Plaintiff–Appellant.

Jeffrey M. Garrod, Orloff, Lowenbach, Stifelman & Siegel, P.A., Roseland, N.J. (Linda B. Lewinter, Craig A. Ollenschleger of Counsel) for Defendants–Appellees.

Before: CABRANES and POOLER, Circuit Judges and TRAGER, District Judge.*

POOLER, Circuit Judge:

Plaintiff Nora Beverages, Inc., ("Nora") appeals from a grant of summary judgment entered on December 10, 1997, in the United States District Court for the District of Connecticut (Ellen Bree Burns, *Judge*). The judgment dismissed Nora's trade dress and Connecticut statutory and common law claims against defendants Perrier Group of America, Inc. ("PGA"), Poland Spring Corporation ("Poland Spring"), Zephyrhills Corporation ("Zephyrhills"), Arrowhead Water Corporation ("Arrowhead"), and Calistoga Mineral Water Company, Inc. ("Calistoga") (collectively, "Perrier"). We affirm the grant of summary judgment on most of Nora's state law claims but we vacate and remand Nora's trade dress claim for further findings and reverse the district court's entry of judgment on one of Nora's two contractual claims. Remanding the trade dress claim requires that we also remand one of Nora's state statutory claims.

## BACKGROUND

Nora, a Canadian company with its principal place of business in Quebec, Canada, bottles at the source and markets a natural spring water brand known as NAYA.[1] Since beginning its spring water operation in May

---

* The Honorable David G. Trager of the Eastern District of New York, sitting by designation.

1. For purposes of reviewing the district court's grant of summary judgment, we adopt Nora's competent and material allegations.

1986, Nora has bottled and sold NAYA water in 1.5–liter clear plastic bottles, made from a resin called polyethylene terephthalate ("PET"). Prior to introducing NAYA in 1986, Nora reviewed approximately fifty to sixty potential designs, ultimately adopting a 1.5–liter PET ribbed bottle with a "waist" that created a "bottle upon bottle" effect.[2] The NAYA bottle bears a dark blue label with a lighter blue insert containing the word "NAYA" in dark blue letters outlined in white.

PGA, a Delaware corporation with its headquarters in Connecticut, distributes and markets various brands of domestically produced bottled water throughout the United States. PGA's former subsidiary corporations—Poland Spring, Zephyrhills, Arrowhead, and Calistoga—are all American companies principally engaged in the distribution and marketing of spring water under various brand names in diverse regions of the United States. Although Poland Spring, Zephyrhills, Arrowhead, and Calistoga all sold spring water in the United States prior to Nora's entry into the market, defendants did not sell spring water in "convenience-size" 1.5–liter bottles.

Wishing to enter the market for convenience-size spring water, PGA—in 1986 and 1987—negotiated with both Johnson Controls, Inc. ("Johnson") and Sewell Plastics, Inc. ("Sewell") to produce PET bottles for its waters. In dealing with both bottlers, PGA indicated a preference for all or part of the NAYA bottle design. PGA selected Sewell as its bottler, but Sewell proved technically unable to perform the work.

Thus, in early 1988, PGA began to discuss with Nora the possibility of Nora supplying bottles to PGA and its subsidiaries. On March 1, 1988, Nora sent Perrier a letter offering two prices for its bottles: (1) to the extent that defendants furnished their own water, Nora would bottle it in 1.5–liter bottles for $3.25 per case and (2) Nora would provide both NAYA water and bottling services for $3.75 per case. Nora proposed that it would provide approximately three million

bottles during 1988 and indicated that its quote would be valid for one month. Nora also promised PGA a quote on twelve-ounce bottles within three weeks.

On March 23, 1988, Frank Szczesniak, PGA's purchasing manager, wrote to Dr. Malek Basbous, a former president of Nora who acted on Nora's behalf in the contract negotiations with PGA:

> This letter will serve as our agreement and understanding between Nora Beverages and the Perrier Group regarding contract packaging a 1.5–liter container.
>
> — The contract price will be $3.25 per case without water or $3.75 using your water.
>
> — The contract price will include a bottle, label, case, and cap.
>
> — Our projections are ½ to 1 million cases for the 1.5 liter container.
>
> — We expect to make the initial finished product shipments the first week in May.
>
> — We will provide Poland Springs water in 6300 tankers to your Mirabel facility. The Zephyrhills product will use your water.

Over the next several months, the parties circulated draft contracts for some of the PGA subsidiaries. In a communication received by Basbous on April 6, 1988, Nora's president, Ahmad Hbouss, confirmed that Basbous would receive a five percent commission "in the event of conclusion of a contract between our company and Perrier." On May 17, 1998, Naji Barsoum, Nora's export manager, sent Jean–Guy Lord, Nora's executive vice-president, an office memorandum indicating that negotiations with PGA had stopped.

PGA selected Johnson to supply its bottles in May 1988. In early 1989, defendants introduced convenience-size bottles of Poland Spring, Arrowhead, and Zephyrhills water, packaged in 1.5–liter ribbed PET bottles. PGA's bottles—with the exception of distinctive labels—are virtually identical to

---

**2.** Appendix A contains photographs of the NAYA bottle and of defendants' allegedly infringing bottles.

NAYA's.[3] Both the NAYA bottles and the various PGA brand bottles are made of clear PET. The top half of each bottle has an indentation for the product's label. Below the label is a rib and below the rib is an indented rib or "waist." Below the waist is a series of ribs.

Nora filed a complaint in the district court for the District of Connecticut on December 3, 1991. Nora sued (1) all defendants for unjust enrichment, trade dress infringement, and trade secret misappropriation, (2) all defendants except Calistoga for breach of confidential relationship, (3) PGA and Poland Spring for violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. St. Ann. § 42–110a *et seq.*, and (4) PGA for breach of contract (with respect to both the 1.5–liter and twelve-ounce bottles) and in *quantum meruit.* On October 13, 1994, defendants moved for summary judgment dismissal of Nora's complaint. Nora cross-moved for partial summary judgment on its 1.5–liter contractual claim and its twelve-ounce contractual claim with respect to the Poland Spring and Zephyrhills brands only and on its trade dress infringement claim against all defendants.

In a December 3, 1997, ruling, the district court granted defendants' motion for summary judgment and denied plaintiff's motion for partial summary judgment. The court found that (1) Nora failed to establish the formation of a contract for sale of either the 1.5–liter or the twelve-ounce bottles because the March 23, 1988, letter was "merely a predicate to further negotiations among the parties," the Statute of Frauds barred reliance on the March 23, 1988, letter, and the March 23 letter could not be construed as a requirements contract; (2) the facts did not support a claim for *quantum meruit* or unjust enrichment; (3) Nora's trade dress claim failed because its trade dress was generic and Nora failed to demonstrate consumer confusion; (4) Nora could not establish a claim for trade secret misappropri-

ation because Nora voluntarily showed its 1988 marketing plan—the alleged trade secret—to defendants and the plan also was readily ascertainable by observation of the marketplace; (5) Nora's common law claim for "breach of confidential relationship" duplicated its statutory claim for trade secret misappropriation and was preempted by the governing statute; and (6) because Nora's CUTPA claim relied on acts incorporated from earlier counts of the complaint, which the court previously had dismissed, the CUTPA claim must also be dismissed. Nora appealed from the December 10, 1997, judgment incorporating the district court's holding.

## DISCUSSION

### I. Summary Judgment Standard

We review *de novo* the district court's grant of summary judgment. *Adams v. Dep't of Juvenile Justice of the City of New York,* 143 F.3d 61, 65 (2d Cir.1998). Several often-cited principles guide our analysis. First, summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.* Second, the movant has the burden of showing that no disputes of material fact exist. *Id.* However, as to issues on which the non-moving party bears the burden of proof, the moving party may simply point out the absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Finally, the court must "resolve[ ] all ambiguities and draw[ ] all factual inferences in favor of the nonmoving party." *Adams,* 143 F.3d at 65.

### II. The Trade Dress Infringement Claim

Nora claims that the defendants violated Section 43(a) of the Lanham Trademark Act ("Lanham Act"), 15 U.S.C. § 1125(a), by copying Nora's trade dress.[4] In its com-

---

**3.** *See* Appendix A for photographs of the NAYA bottle and the PGA bottles.

**4.** Section 43(a) provides, in pertinent part, that

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which

plaint, Nora defined its trade dress as a "unique and distinctive 1.5–liter clear plastic PET bottle ... which features a 'ribbed' and 'bottle upon bottle' effect."

 Trade dress "encompasses the design and appearance of the product together with all the elements making up the overall image that serves to identify the product presented to the consumer ... includ[ing] the appearance of labels, wrappers and containers used in packaging [the] product." *Fun–Damental Too, Ltd. v. Gemmy Indus. Corp.,* 111 F.3d 993, 999 (2d Cir.1997) (citing *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 31 (2d Cir.1995)). The Lanham Act protects trade dress that (1) is either inherently distinctive or has acquired distinctiveness through a secondary meaning and (2) is not functional. *See id.* The plaintiff bears the burden of proof on distinctiveness, but functionality is a defense to be raised by the defendant. *See Jeffrey Milstein,* 58 F.3d at 31. In order to recover for infringement of protectable trade dress, its owner must also show that there is a likelihood of confusion between its trade dress and the allegedly infringing trade dress. *Fun–Damental, Too,* 111 F.3d at 999 (2d Cir.1997)

## A. Distinctiveness

 We judge the distinctiveness of packaging trade dress, such as Nora's bottle, "on a spectrum of increasing distinctiveness as generic, descriptive, suggestive, or arbitrary/fanciful." [5] *Fun–Damental, Too,* 111 F.3d at 1000. Suggestive, arbitrary, or fanciful trade dress is considered inherently distinctive and thus protectable unless it is also functional. *Id.* Because manufacturers and retailers have a "virtually unlimited" choice of packaging and labeling materials available to them, most packaging trade dress is arbitrary, fanciful or suggestive. *Id.* However,

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person....

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

"trade dress protection has limits." *Id.* Descriptive trade dress merits protection only if it has acquired secondary meaning in the marketplace. *Id.* Generic trade dress "consist[ing] of the shape of a product that conforms to a well-established industry custom" is not protectable. *Id.* The "packaging [of] lime-flavored soda in green twelve-ounce cans" is a classic example of generic trade dress because it "is so common in the soft-drink industry". *Paddington Corp. v. Attiki Importers & Distribs., Inc.,* 996 F.2d 577, 583 (2d Cir.1993). The focus of the distinctiveness inquiry, and the ultimate test of protectability under the Lanham Act, is whether the plaintiff's trade dress is capable of distinguishing the plaintiff's goods from those of others. *See Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).

The district court held that "the proliferation of spring waters in 1.5 liter ribbed bottles has made this particular container plainly generic." In reaching this conclusion, the court relied explicitly on photographs of spring water bottles similar to Nora's. Some of the photographs were of defendants' products, while others depicted products that are unrelated to defendants. In addition, the court relied on the verification of Michael J. Harrison, general counsel to Evian's United States importer. In his verification, Harrison stated that Evian had sold its spring water in the United States in 1.5–liter clear, ribbed PET bottles since 1986. However, the record does not indicate when the photographs were taken, and Judge Burns previously had stricken the Harrison verification from the record. The court also may have relied on its findings that (1) several companies in the United States manufactured PET bottles for the soft-drink industry in the late 1970's to early 1980's; (2) Arrowhead began

15 U.S.C. § 1125(a).

**5.** Product configuration trade dress is judged differently, *see Landscape Forms, Inc. v. Columbia Cascade Co.,* 113 F.3d 373, 378 (2d Cir.1997), but Nora's bottle properly is considered packaging, *see Paddington Corp. v. Attiki Importers & Distribs.,* 996 F.2d 577, 583 (2d Cir.1993) (classifying ouzo bottle using packaging analysis).

to sell its carbonated water in a 1.5–liter PET bottle in approximately 1983; (3) the use of 1.5–liter PET bottles for spring water was common by 1983;[6] and (4) Evian introduced a 1.5–liter ribbed PET bottle in 1986 and continues to sell its water in that bottle.[7]

On appeal, Nora argues that the district court erred by (1) relying on the undated photos and the Harrison verification; (2) considering bottles introduced into the market after Nora began using its trade dress; (3) characterizing Nora's trade dress claim as covering *any* 1.5–liter clear, ribbed PET bottle; (4) misapplying the inherent distinctiveness standard; and (5) ignoring Nora's substantial evidence that it was the first spring water company to use a 1.5–liter clear, ribbed PET bottle with a "bottle upon bottle" effect. In response, Perrier argues that Nora cannot seek protection for its bottle alone because its trade dress includes its label. Perrier also contends that the relevant date for determining the distinctiveness of Nora's trade dress is the date of the alleged infringement rather than the date that Nora introduced its trade dress. Finally, Perrier argues that the district court correctly determined—independent of the Harrison verification—that the uncontroverted evidence established that Nora's trade dress was generic and that we can reverse this finding only if it is clearly erroneous.

The parties' arguments require that before addressing Judge Burns' conclusion on distinctiveness, we answer three preliminary questions: (1) whether Nora can claim Lanham Act protection for its bottle shape independent of the label; (2) whether the appropriate date for judging distinctiveness is the date Nora introduced its bottle or the date Perrier introduced the allegedly infringing bottles; and (3) whether we review Judge Burns' finding using a *de novo* or a clearly erroneous standard.

■ Nora admits, as it must, that its trade dress includes its label. Individual elements of a product's trade dress such as

the shape of the NAYA bottle "may be eligible for trademark protection in their own right, but in an action for trade dress infringement each aspect should be viewed in relation to the entire trade dress." *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1042 (2d Cir.1992). Thus, the court, in its distinctiveness analysis, may consider the total package and/or its individual elements including bottle shape. *See id.; see also Source Perrier, S.A. v. Waters of Saratoga Springs, Inc.*, 217 U.S.P.Q. 617, 619, 1982 WL 51044 (S.D.N.Y.1982) (according Lanham Act protection to Perrier's "Indian Club Bottle"). However, the likelihood of confusion analysis must consider the elements for which protection is claimed in the context of the entire trade dress. *See Bristol–Myers Squibb*, 973 F.2d at 1046 (stating that "presence and prominence of markings tending to dispel confusion as to the origin, sponsorship or approval of the goods in question ... can go far towards eliminating any possible confusion"). Therefore, Nora can claim protection for its bottle shape if it is distinctive and non-functional, but defendants' labels must be considered in the likelihood of confusion analysis.

■ The parties also dispute the relevant date for judging the distinctiveness of Nora's trade dress. Perrier argues that March 1989, when Perrier introduced its convenience-size bottles, is the relevant date while Nora claims that June 1986, when it introduced its spring waters in PET containers, is the controlling date. Competitors are free to use an owner's trade dress if it has become generic over time even if it was originally distinctive. *Cf. Defiance Button Machine Co. v. C & C Metal Prods. Corp.*, 759 F.2d 1053, 1059 (2d Cir.1985) (trademark analysis). Therefore, Perrier is correct, and the district court's holding must be affirmed if Nora's trade dress became generic before March 1989.

---

6. The district court made this finding without citation to the record. Based on our independent review of the record, we conclude that the court's finding lacks factual support.

7. The findings concerning Evian are explicitly premised on the Harrison verification. However, as discussed [below at 12], the record contains additional evidence of Evian's use of a 1.5 liter, ribbed PET bottle prior to 1989.

As a final preliminary matter, we turn to Perrier's argument, which is based on *Bristol–Myers,* that the district court's distinctiveness finding is subject to a "stringent, clearly erroneous standard of review." In *Bristol–Myers,* we reviewed the district court's grant of a preliminary injunction. 973 F.2d at 1036. In that context, we held that we would reverse the district court's factual finding concerning the distinctiveness of a mark only if it was clearly erroneous. *Id.* at 1039–40. Here, in contrast, the district court's task was to determine whether there were issues of fact concerning the distinctiveness of Nora's trade dress. This question is subject to *de novo* review. *Cf. Buti v. Perosa, S.R.L.,* 139 F.3d 98, 101 (2d Cir.) (applying *de novo* standard of review to grant of summary judgment in a Lanham Act case), *cert. denied,* —— U.S. ——, 119 S.Ct. 73, 142 L.Ed.2d 57 (1998).

Thus, we review the district court's distinctiveness conclusion using a *de novo* standard of review, focusing on the NAYA bottle shape, and adopting March 1989 as the controlling date. We conclude, for several reasons, that the district court overlooked material issues of fact on the distinctiveness of the NAYA bottle. First, the court improperly relied on the Harrison verification, which it had stricken, and the undated photos, which could not support a conclusion that the NAYA bottle had become generic by 1989. Second, although Perrier produced competent proof—in addition to the Harrison verification—that Evian, the market leader in the spring water industry, was in the United States market with a 1.5–liter ribbed PVC bottle for mineral water before Nora entered the market, Nora introduced proof that the Evian bottle was tinted blue and that its design differed from Nora's bottle-upon-bottle design. These differences would allow a finder of fact to conclude that the NAYA bottle was distinctive despite the pre-existing Evian bottle. Third, the use of PVC containers for mineral water and ribbed PVC containers for carbonated water does not es-

tablish conclusively that Nora's particular PET bottle design for mineral water was generic.[8] In sum, in light of Nora's evidence that the NAYA bottle design was unique at the time of its introduction in 1986, we conclude that the record is insufficient to support the district court's conclusion that there was no genuine factual dispute as to whether the bottle had become generic three years later, at the time defendants introduced their allegedly infringing bottles.

**B. Likelihood of Confusion**

"[T]he law of this Circuit requires that courts consider the eight factors elaborated in· *Polaroid [v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.1961) ]" in determining whether there is a likelihood of confusion. *Cadbury Beverages, Inc. v. Cott Corp.,* 73 F.3d 474, 478 (2d Cir.1996). These factors are: "(1) the strength of the plaintiff's mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the prior owner will 'bridge the gap' ...; (5) actual confusion; (6) the defendant's good faith in adopting its mark; (7) the quality of the defendants's product; and (8) the sophistication of the buyers." *Id.* We previously have noted that "summary judgment [on likelihood of confusion] is appropriate where the undisputed evidence would lead only to one conclusion under the *Polaroid* test." *Sports Auth., Inc. v. Prime Hospitality Corp.,* 89 F.3d 955, 960 (2d Cir.1996) (internal quotation marks omitted).

The district court truncated the *Polaroid* inquiry by finding that Nora could not establish *actual* confusion because the court had stricken the declaration of Nora's expert on actual confusion. This analysis was incorrect. Although a trade dress plaintiff cannot obtain damages without proof of actual confusion, it can obtain injunctive relief without showing actual confusion. *See Coach Leatherware Co., Inc. v. AnnTaylor, Inc.,* 933 F.2d 162, 171 (2d Cir.1991).[9] Be-

8. Perrier sought to supplement the record on appeal to include evidence that Nora allowed another bottler to use its bottles. This motion was denied. Assuming Perrier's evidence was competent, it would support a finding that

Nora's trade dress was generic but, in light of the other evidence in the record, would not be conclusive.

9. Nora also urges that a finding of actual confusion is not required for its request for an ac-

cause Nora requested both damages and injunctive relief, the court erred by failing to review the remaining *Polaroid* factors. The district court also failed to consider additional evidence that Nora offered concerning actual confusion.[10] We therefore remand Nora's trade dress claims to the district court for further consideration consistent with this opinion.[11]

## III. The Contractual Claims

### A. *The Preliminary Evidentiary Issue*

Before ruling on the summary judgment motions, the district court granted defendants' motion *in limine* to preclude testimony by, and suppress the written opinions of, Michael Weinstein and Ronald Mattarolo, Nora's contracting practices experts. Judge Burns found that (1) both opinions should be excluded because "they inappropriately instruct the Court on what result to reach in this case;" (2) Weinstein lacked sufficient credentials in his purported field of expertise; (3) both Weinstein and Mattarolo offered opinions that were insufficiently reliable to assist the trier of fact; and (4) both opinions were irrelevant to the issues in this lawsuit because both opinions were "premised on the assumption that the parties have started 'performance,' defined as the actual production of bottles." Nora urges that Judge Burns erred in striking its expert opinions on contracting practices in the beverages industry.

▇▇▇▇ On a summary judgment motion, the district court properly considers only evidence that would be admissible at trial. *See Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir.1997). Because the district court has wide discretion in determining which evidence is admissible, we review its evidentiary rulings for manifest error. *Id.* at 65–66. The court should admit specialized expert testimony if the witness is "qualified as an expert by knowledge, skill, experience, training or education" and his testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. The district court did not commit manifest error by determining that Weinstein's experience as a marketer in the beverage industry did not qualify him to testify on contract negotiations because Weinstein conceded that he was never directly involved in negotiating co-packing agreements and could not recall the details of any co-packing agreements into which his company entered. We also find no manifest error in the district court's determination that Weinstein and Mattarolo's opinions were not relevant. Both experts explained that the custom of entering into an agreement by means other than a formal contract included the actual production of bottles. Nora offered no proof that it had started to perform by actually producing bottles or incurring any other significant expense. Therefore, the experts' opinions may have tended to mislead rather than assist the finder of fact. Thus, in reviewing the district court's decision on summary judgment, we do not rely on either the Weinstein or the Mattarolo opinion.

### B. *Choice of Law*

Nora contends that the Connecticut Uniform Commercial Code ("U.C.C.") governs its contract claims because those claims concern the sale of goods. Defendants do not

counting. In order to establish entitlement to an accounting, Nora must show that Perrier engaged in willful deception and, especially in the absence of egregious fraud, may need to show that Perrier benefitted from the allegedly infringing trade dress. *George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1540 (2d Cir.1992).

**10.** We express no view as to whether the additional evidence of actual confusion sufficed to create an issue of fact, believing that this determination should be left to the district court in the first instance.

**11.** Relying largely on our decision in *Bristol–Myers*, 973 F.2d at 1047, the defendants contend that, because of the prominence of the labels on the bottles at issue, no rational trier of fact could conclude that there is a likelihood of confusion as to the origin of defendants' products. We believe that the district court should consider this argument in the context of its assessment of the remaining *Polaroid* factors. Nothing in this opinion precludes the district court on remand from granting summary judgment to Perrier should it determine on review of all the material evidence that (1) Nora's trade dress was functional or (2) there are no issues of fact on likelihood of confusion.

directly dispute this claim, arguing instead that common law contract principles inform the proper interpretation of the U.C.C. The district court assumed the applicability of common law principles to the contract formation issue, although it determined the statute of frauds issue under the U.C.C. More specifically, the district court found as a matter of law that the parties had not achieved agreement on the 1.5 liter bottling agreement in part because (1) different contracts were obviously necessary for each of the PGA subsidiaries and each had different requirements and (2) significant terms such as "[i]ndemnification, insurance, minimum quantities, price increases, quality control, choice of law, length of contract and confidentiality ... remained unresolved in each of the proposed contracts." The district court also analyzed the factors that we set forth in *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir.1985) to assist in determining—under New York law—whether the parties intended to be bound in the absence of documents executed by each side. The court found that each of the *Winston* factors favored a conclusion that there had been no contract. Applying the U.C.C. Statute of Frauds, the court also found that the alleged contract failed for lack of a sufficient writing.

■ The UCC governs contracts for the sale of goods. Conn. Gen.Stat. Ann. § 42a–2–102. However, the alleged contract between Nora and PGA required Nora to provide both goods (the bottles) and bottling services. To determine whether a contract including both goods and services is governed by the U.C.C., the court must determine "whether the dominant factor or 'essence' of the transaction is the sale of the materials or the services." *Incomm, Inc. v. Thermo–Spa, Inc.*, 41 Conn.Supp. 566, 595 A.2d 954, 956–57 (Conn.Super.Ct.1991). The record does not indicate whether the alleged contracts predominantly involved goods or services. Therefore, we will consider whether issues of fact exist on contract formation under either the U.C.C. or Connecticut common law.

### C. The Alleged 1.5–Liter Contract

■ We first consider whether there are issues of fact concerning formation of the 1.5–liter contract under the U.C.C. Pursuant to the Code, "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Conn. Gen.Stat. Ann. § 42a–2–204(1). The contract will not fail for indefiniteness because "one or more terms are left open ... if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy. *Id.* § 42a–2–204(3). However, "[t]he more terms the parties leave open, the less likely it is that they have intended to conclude a binding agreement." *Id.*, cmt.

PGA—the only defendant on Nora's contract claim—identifies substantial evidence supporting the district court's conclusion that the parties never reached agreement. For example, Nora's agent, Basbous, reported to Nora's president, Hbouss, on March 29, 1988, that "Perrier request[s] a contract" and "[f]inal contract negotiations will follow...." More importantly, Hbouss told Basbous on or about April 6, 1998, that Basbous would receive a commission "in the event of conclusion of a contract between our company and Perrier within the coming month." PGA also points to documents indicating that agreements with various PGA subsidiaries had yet to be completed and that the quantity term for certain of those contracts had not been set. We do not view Nora's failure to complete formal contracts with Arrowhead, Poland Spring, and Zephyrhills as conclusive on the issue of whether a contract was formed between PGA and Nora because PGA, as the umbrella company, could well have entered into a master agreement with Nora that contemplated the execution of more particularized agreements between Nora and PGA's subsidiaries. Nonetheless, this summary demonstrates that powerful evidence, including an implicit admission by Nora's Hbouss, undermines Nora's claim that the parties had arrived at a meeting of the minds.

However, Nora also marshaled significant evidence that the parties did arrive at a meeting of the minds. The most persuasive evidence of agreement is the March 23, 1988, letter of Frank Szczesniak, PGA's purchasing

manager, to Nora's agent, Basbous. Szczesniak said "[t]his letter will serve as our agreement and understanding between Nora Beverages and the Perrier Group regarding contract packaging a 1.5–liter container." The letter also contained a price term identical to that proposed by Nora on March 1, 1988. Szczesniak estimated PGA's needs at between one-half million and one million cases and specified that the contract price would include a bottle, label, case and cap. Just as Hbouss' reference to a contract being completed in the future is powerful evidence that the parties did not agree on all terms, Sczcesniak's assertion that his letter would serve as "our agreement and understanding" regarding the 1.5–liter packaging is powerful evidence that the parties did agree. Additional evidence favoring plaintiff's position on contract formation can be found in the preparatory steps the parties took for performance under the alleged agreement. For instance, PGA sent Nora art mechanicals for the Poland Spring and Zephyrhills label and corrugation. In addition, although Basbous spoke of the need for a contract in one communication to Hbouss, he also referred in another communication to "our agreement confirmed by telex from both sides and the object of a more developed text that our attorneys are finalizing."

PGA argues, nevertheless, that there was no contract because the parties had not agreed on the critical terms of duration of the contract or quantity. We believe that a reasonable fact finder could determine that PGA and Nora reached at least a limited agreement on both quantity and duration. Arguably, the March 23 letter obligated PGA to purchase at least 500,000 cases of the 1.5–liter bottles. The record also contains information from which a finder of fact could infer that the parties had arrived at a duration term. The March 1 letter from Nora to PGA offers a price and projects a quantity of 3,000,000 bottles for 1988. The March 23 letter from PGA to Nora confirms the price

per case and increases the projected quantity to a minimum of 500,000 cases of twelve bottles each. From this sequence, the fact-finder could infer that PGA and Nora contracted for the sale of at least 500,000 cases during the balance of 1988. Moreover, the record contains some evidence that PGA understood that it would have to commit to a term of between two and three years to obtain PET bottles. Sandy Albert, PGA's purchasing manager, testified that most companies required a two-to-three year commitment prior to undertaking a new PET project. In addition, a Sewell Plastics representative testified that "as was fairly common in the plastics industry," Sewell wanted a multi-year arrangement prior to entering into a bottling agreement. Because the UCC does not treat open terms as defeating a contract if there is a reasonable commercial basis for supplying the term, *see* Conn. Gen.Stat. Ann. § 42a–2–204, cmt, and the fact finder reasonably could infer duration either from PGA's concession on industry practice or from the March 1 letter read together with the March 23 letter, we find that under the U.C.C. there are issues of fact as to whether PGA and Nora arrived at a contract for the 1.5–liter bottles.

We now must consider whether the alleged contract would be barred by the U.C.C.'s statute of frauds, which states that "a contract for the sale of goods for a price of five hundred dollars or more is not enforceable ... unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought." Conn. Gen. St. Ann. § 42a–2–201. The statute further indicates that "[a] writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable ... beyond the quantity of goods shown in such writing." [12] *Id.* The three irreducible requirements of § 42a–2–201 are that the writing "must evidence a contract for the sale of goods; sec-

---

12. The district court addressed the statute of frauds question with respect to Poland Spring, Zephyrhills, and Arrowhead—the three PGA subsidiaries whose bottling requirements were discussed in negotiations between PGA and Nora. However, Nora did not claim to have a contract with these defendants. Its contractual claims run solely against PGA. Therefore, we believe the district court should have focused on whether the March 23 letter satisfied the statute of frauds as to the alleged contract between PGA and Nora.

ond, it must be 'signed,' a word which includes any authentication which identifies the party to be charged; and third, it must specify a quantity." *Id.*, cmt. Because the March 23 letter speaks of an agreement to sell goods, it satisfies the first requirement. Having been signed, it satisfies the second requirement. PGA argues, however, that because the quantity term in the letter is a projected range, Nora cannot satisfy the last requirement. PGA principally relies on *Omega Eng'g, Inc. v. Eastman Kodak Co.,* 908 F.Supp. 1084 (D.Conn.1995), in which the court found a contract unenforceable for failure to satisfy the statute of frauds, *see id.* at 1090. Because the alleged contract in *Omega* specified *no* quantity term, *Omega* does not support PGA's argument. *See id.* at 1090. The commentary to the U.C.C. indicates that quantity "need not be accurately stated but recovery is limited to the amount stated." Conn. Gen.Stat. Ann. § 42a–2–201. This language suggests that description of quantity in terms of a range satisfies the Statute of Frauds but that the plaintiff may be limited in its recovery to the lower end of the range. Thus, PGA did not establish that the statute of frauds barred Nora's claim.

■ We also conclude that Nora demonstrated issues of fact on contract formation using a common law analysis. Under the Connecticut common law, we must first examine the March 23 letter to see if it expressly requires the execution of a formal contract. *See Atlantic Terra Cotta Co. v. Chesapeake Terra Cotta Co.,* 96 Conn. 88, 113 A. 156, 158 (Conn.1921). If it does not, "it becomes a question of fact whether the parties intended the agreement in a certain memorandum to constitute a contract or intended that there should be no contract until the execution of a formal written contract." *See id.* 113 A. at 158–59.

■ Because the March 23 letter contained no express condition of a formal contract, we must determine whether there are issues of fact concerning the parties' intent. The same evidence that persuaded us to find issues of fact under the U.C.C. convince us that there are issues of fact as to the parties' intent under the common law. We also believe that there are issues of fact as to

whether the parties sufficiently defined the terms of their agreement to create a contract. Connecticut common law requires that a contract "be definite and certain as to its terms and requirements." *Dunham v. Dunham,* 204 Conn. 303, 528 A.2d 1123, 1129 (Conn.1987) (citations omitted). However, the trier of fact determines whether an agreement has been made and what the terms of the agreement are. *Presidential Capital Corp. v. Reale,* 231 Conn. 500, 652 A.2d 489, 492 (Conn.1994). Moreover, if the trier of fact can find a reasonable basis for implying a missing term—such as price—the absence of the term is not fatal to the contract. *Id.* 652 A.2d at 493.

Applying these standards, we do not believe that the omissions the district court identified in the PGA–Nora contract—indemnification, insurance, price increases, quality control, choice of law, length of contract and confidentiality—are necessarily fatal to the contract's existence. As previously discussed, we disagree with the district court's conclusion that the contract necessarily lacked a quantity term. Therefore, we must reverse the district court's grant of summary judgment on the 1.5–liter bottle contract claim.

### D. The Alleged Twelve–Ounce Contract

■ We agree with the district court that there are no facts in the record from which the finder of fact reasonably could infer that PGA and Nora entered into a contract with regard to the supply of twelve-ounce bottles to PGA. The March 23 letter serves as an "agreement and understanding between Nora Beverages and the Perrier Group regarding contract packaging a 1.5 liter container." The letter's only reference to the twelve-ounce size is Szczesniak's expressed hope to receive a timetable within the next few days. It does not contain either a price or a quantity term and contains no basis from which price or quantity readily could be inferred. Moreover, Barsoum's March 1, 1988, letter to Lisa Hatem of PGA refers to the twelve-ounce bottle only in passing. We have reviewed all of the evidence that Nora claims creates issues of fact on the formation of a contract for provision of the twelve-

ounce bottle and find nothing from which a reasonable fact finder could infer that Nora and PGA reached an agreement.

## IV. Misappropriation of Trade Secrets

 In the sixth cause of action of its complaint, Nora alleged that all of the defendants violated the Connecticut Uniform Trade Secrets Act ("CUTSA"), Conn. Gen. Stat. Ann § 35–51 *et. seq.* by misappropriating its trade secrets specifically including (1) [Nora's] marketing strategies and data . . .; (2) techniques for advertising, promoting and distributing 1.5 liter and single serve PET bottle sizes containing natural spring water; (3) plaintiff's water extraction, filtration and bottling processes; (4) plaintiff's preform manufacturing and bottle production processes; (5) the results of [Nora's] own research and testing of its "Naya" natural spring water; (6) plaintiff's production and overhead costs . . .; (7) final bottle designs for the 1.5 liter and 12–ounce sizes; (8) names of distributors and suppliers . . .; and (9) other important information . . . .

The district court dismissed this claim because it found that (1) Nora showed the marketing plan to defendants and (2) information in the marketing plan was readily discernible from observation of the marketplace.

Section 35–51(b) of CUTSA defines misappropriation as

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of a trade secret of another without express or implied consent by a person who (A) used improper means to acquire knowledge of the trade secret; or (B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was (i) derived from or through a person who had utilized improper means to acquire it; (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, . . ., (iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (C)

before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Conn. Gen.Stat. Ann. § 35–51(b).

Thus, a violation of CUTSA occurs only if the defendant either wrongfully acquired the plaintiff's trade secret or used or disclosed the trade secret. Nora has offered no proof that defendants acquired its trade secrets in contravention of Section 35–51(b). Instead, the uncontroverted proof establishes that Nora gave PGA the alleged trade secrets in the course of negotiating a contractual relationship. Nora also offered no proof that any defendant disclosed or used Nora's trade secrets. When specifically asked to identify the facts that led him to believe defendants used Nora's trade secrets, Nora's vice-president, Naji Barsoum, replied:

I was not with them to see what they've used, but they did use it. I mean, I can't go and ask a million—260 million American people what they heard and listen to them. I can't answer the question like that. Of course they did. I mean it's common knowledge they did . . . . They copied our bottle. They came to us, they took all of the information they wanted and they went back and behind our back went to put the product on the market.

 The only use that Barsoum described is defendants' reproduction of Nora's bottles. These bottles, however, were not trade secrets because they were readily observable in the market place. *See* Conn. Gen.Stat. Ann. § 35–51(d) (defining trade secrets as information not "readily ascertainable by proper means"). Because the shape of Nora's bottle was not a trade secret and Nora offered no evidence of wrongful acquisition or use or disclosure of the remainder of its information, the district court properly dismissed Nora's trade secret claim.

## V. Breach of Confidential Relationship

 In its seventh cause of action, Nora alleges that defendants breached a confidential relationship by using trade secrets, information, and assistance that Nora had given

defendants in anticipation of a continuing contractual relationship to launch their own line of convenience-sized spring water. The district court dismissed Nora's claim, finding that Section 35–57(a) of CUTSA preempted any common law claims related to trade secrets. On appeal, Nora principally argues that CUTSA does not preempt the portions of its common law claim that are (a) contractual in nature or (b) related to information that does not constitute a trade secret.

 The district court correctly found that CUTSA preempts any tort remedy for misuse of trade secrets. *See* Conn. Gen.Stat. Ann. § 35–57(a). However, CUTSA does not preempt "[c]ontractual or other civil liability or relief that is not based on misappropriation of a trade secret." Conn. Gen.Stat. Ann. § 35–57(b). We need not determine what portion of Nora's claims the Connecticut statute preempts because, even assuming that some of Nora's confidential relationship claims are not preempted, plaintiff offers no evidence from which a reasonable jury could find in Nora's favor. With respect to its contractual claim for breach of confidential relationship, Nora offered no evidence from which a reasonable fact finder could determine that PGA agreed—in writing or orally—that it would keep Nora's information confidential. Moreover, Nora failed to establish issues of fact as to whether the parties had a confidential relationship at the time Nora gave PGA confidential information. Nora alleges that it gave PGA confidential information during the course of the negotiations preceding the parties' contract. Under Connecticut law, "[a] ... confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." *Dunham,* 528 A.2d at 1133. Absent special circumstances, we view the negotiation of a contract as the quintessential example of a situation in which there should not be a unique degree of trust and confidence between the parties. Therefore, we affirm the dismissal of count seven of the complaint.

## VI. Connecticut Unfair Trade Practices Act

In its eighth cause of action, Nora alleges that defendants breached the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen.Stat. Ann. § 42–110a *et seq.* by (1) misappropriating Nora's trade secrets; (2) infringing Nora's trade dress; and (3) breaching a confidential relationship with Nora. Because the district court already had granted summary judgment on each of the individual claims referenced in Nora's CUTPA claim, it also granted summary judgment on the CUTPA claim. We affirm the district court's disposition on trade secrets and breach of confidential relationship and thus affirm its dismissal of the CUTPA claim insofar as it rests on the facts alleged in these two incorporated counts. However, we vacate the district court's grant of summary judgment on Nora's trade dress claim and thus also vacate the grant of summary judgment on the CUTPA claim insofar as it rests on a claim of trade dress infringement. *See Timex Corp. v. Stoller,* 961 F.Supp. 374, 381 (D.Conn.1997) (holding that a violation of the Lanham Act establishes liability under CUTPA); *Pfizer, Inc. v. Miles, Inc.,* 868 F.Supp. 437, 442 (D.Conn.1994) (same).

## VII. *Quantum Meruit* and Restitution

 Finally, Nora asserted a *quantum meruit* claim against PGA and an unjust enrichment claim against all defendants. Nora alleged that as a result of PGA's promise to purchase its "foreseeable requirements for 1.5 liter and 12–ounce bottles" from Nora, it "expended ... substantial time, effort and money" that it would not otherwise have expended. Nora also alleged that all defendants benefitted from Nora's expertise and advice as evidenced by the fact that the Perrier defendants were able to launch their own convenience-size spring-water line so quickly. Because the district court found that these claims lacked any factual support, it dismissed them. The court indicated that Nora relied exclusively on allegations that it (1) ordered some equipment to receive Poland Spring water but later canceled the order and (2) decided in late 1988 to build the twelve-ounce bottling line and ordered twelve-ounce molds for its bottle manufactur-

er.[13]

■■■ "To recover under unjust enrichment, the plaintiff must demonstrate: (1) that the defendant has benefitted from the transaction or has received something of value; and (2) that the benefit was unjust." *Garwood & Sons Constr. Co., Inc. v. Centos Assoc. Ltd. Partnership*, 8 Conn.App. 185, 511 A.2d 377, 379 (Conn.App.Ct.1986) (citing *Monarch Accounting Supplies, Inc. v. Prezioso*, 170 Conn. 659, 368 A.2d 6 (Conn. 1976)). The plaintiff may prevail on an implied contract theory by demonstrating that it performed services "at the request of the opposing party and in expectation that compensation would be made for them." *J. & D. Kasper Assoc. v. Merrimac Assoc., Inc.*, 37 Conn.Supp. 712, 435 A.2d 709, 711 (Conn.Super.Ct.1981) (citing, *inter alia, Santoro v. Mack*, 108 Conn. 683, 145 A. 273 (Conn.1929)). The facts cited to the district court judge did not establish either that de-

fendants received a benefit or that Nora performed services at defendants' request. Because Nora canceled the equipment it had ordered and only decided to start a twelve-ounce line after PGA broke off negotiations, the district court correctly determined that Nora could not recover under the theories of implied contract or restitution.

## CONCLUSION

For the reasons discussed, we affirm the district court's grant of summary judgment on counts two, three, four, six, and seven of Nora's complaint. We reverse the grant of summary judgment on count one of the complaint and vacate the grant of summary judgment on count five. We affirm the grant of summary judgment on count eight except insofar as count eight alleges trade dress infringement and vacate on that portion. We remand for proceedings consistent with this opinion.

---

**13.** Nora does not claim that the district court mistakenly characterized the evidence on which Nora relied but does seek to rely on certain additional evidence of expenses it incurred related to the 1.5–liter and twelve-ounce projects. The expenses Nora claims are largely *de minimis*. For instance, Nora claims an unspecified sum for films and form plates related to art work that was never produced and $931.95 for travel expenses in connection with development of the twelve-ounce line. The latter expense redounded to Nora's benefit, not defendants', because Nora did develop a twelve-ounce line. In any case, we decline to consider additional evidence on which Nora did not rely below. *Cf. Chaiken v. VV Publ'g Corp.*, 119 F.3d 1018, 1035 (2d Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1169, 140 L.Ed.2d 179 (1998).