KAUFMAN & FISHER WISH
COMPANY, LTD.,
Plaintiff,

v.

F.A.O. SCHWARZ, Defendant.

No. 01 Civ. 0301 (GEL).

United States District Court,
S.D. New York.

Oct. 3, 2001.

As Amended Oct. 22, 2001.

Eric Vaughn–Flam, Rubin, Bailin, Ortoli, Mayer & Baker LLP, New York City, for Kaufman & Fisher Wish Company, Ltd.

Barry Werbin, Herrick, Feinstein LLP (Stacy. Kellner Rosenberg, of counsel), New York City, for F.A.O. Schwarz.

## AMENDED OPINION AND ORDER

LYNCH, District Judge.

Plaintiff Kaufman & Fisher Wish Company ("K & F") brings this action against Defendant F.A.O. Schwarz ("Schwarz"), alleging that Defendant's design, marketing, and sales of "Alluwishes," a "wishing" plush toy marketed with a charitable tie-in to the Elizabeth Glaser Pediatric AIDS Foundation, infringes upon the packaging and design trade dress of Plaintiff's own soft-sculptured "wishing" doll, "Amanda Love, the Original Wish Doll," which is marketed with its own charitable tie-in to the Make–A–Wish Foundation. K & F asserts that Schwarz's marketing of "Alluwishes" violates section 43(a)(1)(A) of the Lanham Act and state unfair competition law and seeks $6 million in damages and injunctive relief for those alleged violations.

Schwarz has moved for summary judgment, pursuant to Fed.R.Civ.P. 56, seeking dismissal of all of the claims asserted in Plaintiff's action. For the reasons that follow, the motion is granted.

## BACKGROUND

Since 1998, K & F has produced and marketed "Amanda Love, the Original Wish Doll" ("Amanda Love"), a soft-sculptured "wishing" doll designed by its sole shareholder, Susan Fisher Kaufman ("Kaufman").[1] (Kaufman Aff. ¶ 4.) Kaufman conceived the idea for Amanda Love after experiencing personal losses in 1998; the "purpose and primary feature" of the doll was to help children "create, by imagination, a better life situation"–"to create a vehicle to assist in the creation of wishes." (Kaufman Aff. ¶ 2.)

The design of Amanda Love consists of simple geometric forms–a circular head, a triangular body that suggests a dress, and long legs and arms–manufactured using soft off-white cloth encompassing polyester filling. A five-pointed gold star is sewn onto Amanda Love's dress, and a small booklet attached to her arm proclaims that she is "a lovable doll to help you make your wishes come true." Although Amanda Love is intended by K & F to look "angelic" (Kaufman Aff. ¶ 5), she does not have a halo, wings, or other iconographic features conventionally associated with an-

---

**1.** Photographs of Amanda Love and of Schwarz's allegedly infringing product are reproduced in an appendix to this opinion and order.

gels. Amanda Love's packaging incorporates the five-pointed gold star and its registered trademark, "The Original Wish Doll" on the product label. Some of the advertising materials for Amanda Love incorporate these same elements along with three additional motifs: (1) a photograph juxtaposing Amanda Love against a background of blue sky and clouds, (2) the use of an unregistered slogan, "May all your wishes come true!" and (3) the promotion of a charity tie-in by which K & F donates proceeds from the sale of its Amanda Love dolls to the Make–A–Wish Foundation. (Kaufman Aff. ¶¶ 6–9.)

Upon designing and creating the Amanda Love doll, K & F proceeded to contact potential distributors, including Schwarz, a major retailer of toys through its stores, mail-order catalogues, and web site. The parties disagree over the nature of those communications. According to K & F, it first contacted Schwarz in September 1998 and sent promotional materials and samples of Amanda Love in October 1998 at Schwarz's request. (Kaufman Aff. ¶¶ 13–14.) K & F asserts that Schwarz indicated some interest in the product and that the parties continued to correspond throughout the winter and spring of 1998 and 1999, with K & F sending promotional materials to Schwarz throughout that period. (Kaufman Aff. ¶ 16.) Schwarz, however, maintains that it simply informed Kaufman that it was not interested in K & F's product at that point in time. (Niggli Aff. ¶¶ 7–9.)

K & F alleges that on July 30, 1999, Kaufman and counsel for K & F met face-to-face with David Niggli, who at the time was Schwarz's Vice President of Merchandising, K & F maintains that Kaufman presented additional samples of Amanda Love at that meeting and explained in detail the "wishing" theme and purpose of the doll and the relationship of that theme to the product's name, design, packaging,

and marketing plan. According to Kaufman, Niggli indicated that he was enthusiastic about the product but, since the deadline for the Fall 1999 catalogue had passed, that K & F should remain in touch with him for possible inclusion of the product in the Fall 2000 catalogue. (Kaufman Aff. ¶ 17.) Niggli denies recalling any such meeting at any time in 1999. (Niggli Reply Decl. ¶ 3.)

K & F maintains that it remained in contact with Schwarz throughout the winter and spring of 1999 and 2000; Niggli recalls Kaufman to have been "persistent" in her efforts to promote Amanda Love. (Kaufman Aff. ¶ 21; Niggli Decl. ¶ 9.) In the spring of 2000, Kaufman and Niggli (who by then had become Schwarz's Chief Operating Officer) met again to discuss the product, the "wishing" theme and its relationship to the product design, and K & F's marketing plans. Kaufman recalls Niggli to have said at that meeting that he "loved" Amanda Love and the wish doll concept. (Kaufman Aff. ¶ 22.) Niggli, by contrast, maintains that he had no view as to whether Schwarz should offer Amanda Love for sale, and that the company's doll buyer was "emphatic" that Amanda Love should not be distributed and sold by Schwarz at that time. (Niggli Decl. ¶¶ 11–12.) Niggli maintains that he informed Kaufman in a telephone conversation that Schwarz was not then interested in Amanda Love. (Niggli Decl. ¶ 13.)

Following the spring 2000 meeting, Kaufman found it increasingly difficult to communicate with Niggli; eventually, Schwarz refused to take her telephone calls or to meet with her. Still, Kaufman remained under the impression that Schwarz was enthusiastic about Amanda Love—until she viewed the Fall 2000 Schwarz catalogue and saw "Alluwishes." (Kaufman Aff. ¶¶ 23–26.)

Alluwishes, the product that K & F alleges to infringe upon Amanda Love's trade dress, is a plush toy [2] manufactured for Schwarz by a German toy manufacturer, Rudolph Schaeffer ("Schaeffer"). Schwarz maintains that its decision to distribute and sell Alluwishes in its stores and catalogues had nothing to do with K & F or Amanda Love. According to Schwarz, Niggli became aware of the design and theme for Alluwishes after meeting Schaeffer and his wife at a toy fair in Europe during February 2000; the Schaeffers showed the product to Niggli and informed him that they intended to market the product in Europe by Fall 2000 under the name "Ambrosius." Like Amanda Love, Ambrosius/Alluwishes also is intended to be "angelic" in his appearance; according to Niggli, Schwarz decided to license the toy from Schaeffer for distribution and sale in the United States because "guardian angels were a popular theme in the United States" at the time. (Niggli Decl. ¶ 18.) Niggli maintains that he and his colleagues did not think the name "Ambrosius" would work in the United States, and that at some point the name "Aloyisius"–along with the slogan. "Aloyisius grants all your wishes"–suddenly "popped into [his] head." (Niggli Decl. ¶ 18.) The use of the spelling variant "Alluwishes" was designed to emphasize the product's "wishing" theme; in order to use that name, Schwarz sought and obtained a license from another plush toy manufacturer that already owned and had used the similar trademark "Aliwishes" in connection with a plush teddy bear. (Niggli Decl. ¶ 21.) Schwarz commenced marketing and sales of Alluwishes in the fall of 2000.

Like Amanda Love, Alluwishes is designed using simple geometric forms–a circular head, a rectangular body, and large legs and arms. The "angelic" appearance of Alluwishes is suggested by a gold halo over his head, large gold wings extending from his shoulders, and a long-sleeved nightshirt bearing several five-pointed gold stars. A hang-tag attached to Alluwishes explains the "wishing" theme of the toy and promotes Schwarz's own charitable tie-in: "Alluwishes, the angel that grants all your wishes, is exclusively available at FAO Schwarz. We share your commitment towards the well-being of the children of the world. 10% of the retail sales of Alluwishes will be donated to The Elizabeth Glaser Pediatric AIDS Foundation." (Niggli Decl. ¶ 22.) In accordance with Schwarz's customary practice for plush toys, Alluwishes is not sold in any packaging materials; instead, the toys are stacked loose in bins or on shelves.[3] (Niggli Decl. ¶ 23.) Alluwishes is promoted in Schwarz's print catalogue and on its internet web site. In the Fall 2000 catalogue. Alluwishes—like its European cousin Ambrosius—is displayed against a background of blue sky and clouds. (Niggli Decl. ¶ 27–29.)

## DISCUSSION

When adjudicating a motion for summary judgment, all ambiguities must be resolved in favor of the nonmoving party, although "the nonmoving party may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party op-

---

**2.** According to Schwarz, "plush toys" and "dolls" constitute distinct types of products that are sold to distinct markets. (Niggli Decl. ¶ 16 & n. 1.)

**3.** When mail-ordered, however, Alluwishes is wrapped for delivery in transparent plastic similar to that used in the packaging for Amanda Love. (Niggli Reply Decl. ¶ 4.)

posing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996). Summary judgment is then appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

To establish a genuine issue of material fact, the plaintiff " 'must produce specific facts indicating' that a genuine factual issue exists." *Scotto,* 143 F.3d at 114 (quoting *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998)); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "If the evidence [produced by the nonmoving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal citations omitted). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Pocchia v. NYNEX Corp.,* 81 F.3d 275, 277 (2d Cir.1996) (quoting *Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. 2505).

## I. Trade Dress Infringement

■ Section 43(a) of the Lanham Act protects a producer against the use by any person of "any word, term, name, symbol, or device, or any combination thereof ... which ... is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1); *see Wal–Mart Stores, Inc. v.*

*Samara Bros., Inc.,* 529 U.S. 205, 209, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000). Among the types of unregistered marks protected by Lanham Act § 43(a) is "trade dress," a nebulous category that refers to the "overall design and appearance that makes the product identifiable to consumers." *Nora Beverages, Inc. v. The Perrier Group of America, Inc.,* 269 F.3d 114, 118 (2d Cir.2001) (*"Nora Beverages II"*); *see also Samara Bros.,* 529 U.S. at 209, 120 S.Ct. 1339 (trade dress "constitutes a 'symbol' or 'device' for purposes of" Lanham Act § 43(a)); *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 764–65 n. 1, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) (trade dress consists of the "total image and overall appearance ... of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques" (citations and internal quotation marks omitted)). Over the years, the trade dress category has mushroomed to include not simply the literal "dressing" or "packaging" of a product, but also in some instances the design or configuration of the product itself, and the legal principles governing the protection of unregistered trade dress bear close resemblance to the principles governing other registered and unregistered marks. *See Yurman Design, Inc. v. PAJ, Inc.,* 262 F.3d 101, 114 (2d Cir.2001).

■ In order to prevail in an action for trade dress infringement under Lanham Act § 43(a), the plaintiff must demonstrate that (1) its trade dress is "distinctive" as to the source of its goods, and therefore entitled to protection under the Act, (2) the defendant's trade dress infringes upon the plaintiff's trade dress by creating a likelihood of confusion as to the origin, sponsorship, or approval of the defendant's goods, and (3) the matter sought to be protected is not "functional." *See id.* at 114–16. While the Lanham Act pro-

tects the "overall image or appearance" created by a product's design or packaging, the plaintiff must precisely articulate the specific elements that comprise its distinct trade dress, so that courts properly may evaluate claims of infringement and fashion relief that is appropriately tailored to the distinctive combination of elements that merit protection. *See Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir.1997) (plaintiffs must provide "a precise expression of the character and scope of the claimed trade dress"). This articulation requirement also helps to ensure that claims of trade dress infringement are pitched at an appropriate level of generality, for "just as copyright law does not protect ideas but only their concrete expression, neither does trade dress law protect an idea, a concept, or a generalized type of appearance." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 32 (2d Cir.1995); *see Landscape Forms*, 113 F.3d at 381.

A. *Distinctiveness of K & F Wish's Claimed Trade Dress*

 The standard for assessing the "distinctiveness" of a product's trade dress depends on the type of trade dress for which protection is being sought. *See Samara Bros.*, 529 U.S. at 212–16, 120 S.Ct. 1339. If a plaintiff's trade dress consists of the product's packaging, the plaintiff may prove the distinctiveness of that trade dress either by showing that it is "inherently distinctive," in that its "intrinsic nature serves to identify a particular source of a product." *Two Pesos*, 505 U.S. at 768, 112 S.Ct. 2753, or that it has sufficiently "acquired" distinctiveness—conventionally referred to as "secondary meaning," *see Samara Bros.*, 529 U.S. at 211 n. *, 120 S.Ct. 1339—such that, "in the minds of the public, the primary significance of [the trade dress] is to identify the source of the product rather than the product itself."

*Yurman Design*, 262 F.3d at 115 (quoting *Samara Bros.*, 529 U.S. at 210–11, 120 S.Ct. 1339). By contrast, trade dress based on product design or configuration never is "inherently distinctive," since "product design almost invariably serves purposes other than source identification." *Samara Bros.*, 529 U.S. at 213, 120 S.Ct. 1339. In order to gain the protection of product design trade dress under Lanham Act § 43(a), therefore, a plaintiff must demonstrate that its trade dress has "acquired" distinctiveness in the form of "secondary meaning." *See Samara Bros.*, 529 U.S. at 212–13, 120 S.Ct. 1339; *Yurman Design*, 262 F.3d at 115. While the amorphous nature of "trade dress" as a category may make it difficult, in certain cases, to draw a sharp line between "packaging trade dress" and "design trade dress," courts faced with such hard cases have been instructed to "err on the side of caution" by "classify[ing] ambiguous trade dress as product design," rather than product packaging. *Samara Bros.*, 529 U.S. at 215, 120 S.Ct. 1339; *see Landscape Forms, Inc.*, 113 F.3d at 380 (courts must exercise "particular 'caution' when extending protection to product designs"). Here, K & F articulates trade dress infringement based on both its product design and its product packaging.

1. Product Design Trade Dress

K & F asserts that its product design trade dress for Amanda Love consists of the following elements:

[1] simple geometric forms i.e. circular head, triangular body, (suggesting a dress) with [2] long legs and arms, made from [3] soft off-white cloth over [4] polyester fill. The doll is designed to appear [5] "angelic." There is [6] a five pointed gold star sewn onto each doll, (which symbol is repeated throughout the product packaging trade dress). There is [7] a booklet, 2 inches square in

size, attached to the arm of the Original Wish Doll which sets forth the feature of the doll as a wish doll.

*Pl. Mem. Opp.* at 2. K & F claims that Schwarz has infringed upon its trade dress by drawing upon these same elements for its design, packaging, and marketing of Alluwishes.

■ K & F fails to advance sufficient evidence in support of this claim to allow a reasonable juror to conclude that these aspects of the design for Amanda Love, considered as a whole, have acquired distinctiveness in a manner that renders that design protectable as trade dress under Lanham Act § 43(a). While the Second Circuit has characterized the question of secondary meaning as an "essentially factual determination," and therefore "an unlikely candidate for summary judgment," *Coach Leatherware,* 933 F.2d at 169, "[p]roof of secondary meaning entails vigorous evidentiary requirements," and the plaintiff bears a "heavy burden" to prove that its trade dress has acquired secondary meaning. *Thompson Medical Co., Inc. v. Pfizer Inc.,* 753 F.2d 208, 217 (2d Cir. 1985); *20th Century Wear, Inc. v. Sanmark–Stardust Inc.,* 815 F.2d 8, 10 (2d Cir.1987); *cf. Duraco Products, Inc. v. Joy Plastic Enterprises, Ltd.,* 40 F.3d 1431, 1453 (3d Cir.1994) (in a product design trade dress case, secondary meaning "will generally not be easy to establish"). Among the factors that may be considered to determine whether a product's design has acquired secondary meaning are "advertising expenditures, consumer studies linking the name to a source, sales success, unsolicited media coverage of the product, attempts to plagiarize the mark, and length and exclusivity of the mark's use." *Thompson Medical Co.,* 753 F.2d at 217 (citations omitted); *see Coach Leatherware,* 933 F.2d at 169. No one of these factors is determinative, and accordingly each factor need not be demonstrated in order to establish secondary meaning. *See Thompson Medical Co.,* 753 F.2d at 217.

K & F fails to advance evidence sufficient to create a genuine issue of material fact with respect to any of these factors. No survey evidence or direct consumer testimony supports the conclusion that the public identifies the design of Amanda Love with a particular source. K & F has used the design for Amanda Love in the marketplace for only three years, and it has not even demonstrated its use during that period to have been exclusive. Sales of Amanda Love have been minimal (approximately $33,000) during that period, and K & F has not presented any evidence concerning its level of expenditures on advertising. Moreover, the handful of media articles about Amanda Love that K & F identifies do not explicitly link the product's design to its source. Finally, several of the factors relied upon by K & F as constituting part of its allegedly distinctive design trade dress—such as the use of simple geometric forms, a cloth-covering over polyester fill, and an arguably "angelic" appearance—are so essential to the design of any doll or plush toy on an "angel" theme that they could hardly be seen as "distinctive" markers of source, rather than as an intrinsic part of the unprotectable concept of the toy. To base a finding of distinctiveness on such elements would extend "trade dress" protection to the very idea of an "angel" toy. In light of K & F's failure to present evidence suggesting that its product design trade dress has acquired secondary meaning, summary judgment in favor of Schwarz is appropriate. *See Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993) (when non-moving party bears burden of proof at trial, moving party is entitled to summary judgment if non-movant fails to make showing on essential element of its claim).

■ Rather than presenting evidence sufficient to create a genuine issue of material fact as to the distinctiveness of its design for Amanda Love, K & F instead argues that it bears no burden of proving secondary meaning on account of Schwarz's alleged intentional copying of K & F's product design. According to K & F, proof of intentional copying creates a presumption that the copied mark has acquired secondary meaning that shifts the burden to the defendant to prove the *absence* of secondary meaning. *Pl. Mem. Opp.* at 6–12.

The Court disagrees. Proof of intentional copying, by itself, does not trigger any presumption of secondary meaning under Second Circuit precedent.[4] *See Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1042 (2d Cir.1992) ("Although imitative intent can help support a finding of secondary meaning, it does not necessarily mandate one[.]" (citations omitted)). *See also Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 844–845 (9th Cir.1987); *Blau Plumbing, Inc. v. S.O.S. Fix–It, Inc.*, 781 F.2d 604, 611 (7th Cir.1986) (Posner, J.). As the Supreme Court has made clear,

> [t]rade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products. In general, unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying. As the Court has explained, copying is

not always discouraged or disfavored by the laws which preserve our competitive economy.

*TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 121 S.Ct. 1255, 1260, 149 L.Ed.2d 164 (2001) (citing *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 160, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989)); *Nora Beverages II*, 269 F.3d at 119; *see* 2 *McCarthy on Unfair Competition* § 15:38, at 60 ("It must also not be forgotten that there is absolutely nothing legally or morally reprehensible about exact copying of things in the public domain."). Indeed, the probative value of evidence of intentional copying is particularly limited in cases involving product design, since "the copier may very well be exploiting a particularly desirable feature, rather than seeking to confuse consumers as to the source of the product." *Duraco Products, Inc. v. Joy Plastic Enterprises, Ltd.*, 40 F.3d 1431, 1453 (3d Cir.1994); *cf. Samara Bros.*, 529 U.S. at 213, 120 S.Ct. 1339 ("[A]lmost invariably, even the most unusual of product designs–such as a cocktail shaker shaped like a penguin–is intended not to identify the source, but to render the product itself more useful or appealing."); *Fun–Damental Too, Ltd.*, 111 F.3d at 1005 ("It cannot automatically be inferred that intentionally copying a plaintiff's trade dress is for the purpose of deceiving consumers as to the source of the product."). While intentional copying may, in an appropriate case, "constitute[ ]

---

**4.** *But see M. Kramer Mfg. Co. v. Andrews*, 783 F.2d 421, 448 (4th Cir.1986) (holding that "evidence of intentional, direct copying establishes a prima facie case of secondary meaning sufficient to shift the burden of persuasion to the defendant on that issue."); *Hartford House Ltd. v. Hallmark Cards Inc.*, 647 F.Supp. 1533, 1542 (D.Colo.1986) ("Proof of copying may be sufficient in and of itself to establish secondary meaning because there is no reason to copy a non-functional feature except to capitalize on an already existing

secondary meaning."), *aff'd on other grounds*, 846 F.2d 1268 (10th Cir.1988); 2 *McCarthy on Unfair Competition* § 15:38, at 57–58 & n. 5 (characterizing as "minority view" the rule that evidence of intentional copying triggers presumption of secondary meaning, and citing cases); *cf. Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.*, 283 F.2d 551, 558 (9th Cir.1960) ("There is no logical reason for precise copying save an attempt to realize upon a secondary meaning that is in existence.").

persuasive evidence of consumer recognition"—a factor to be considered, among others, when assessing secondary meaning—"conscious replication *alone* does not establish secondary meaning." *Coach Leatherware*, 933 F.2d at 169 (emphasis added); *see also Fun–Damental Too, Ltd. v. Gemmy Industries Corp.*, 111 F.3d 993, 1004 (2d Cir.1997) ("Intentional copying of a product—*by itself*—generally is not relevant to a trade dress infringement claim." (emphasis added)); *Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 136 (2d Cir. 1992) ("evidence that the trade dress or product design was intentionally copied by a competitor *can support* an inference of secondary meaning *if the circumstances indicate an intent to benefit from the good will of the prior user through confusion*" (emphasis added and internal quotation marks omitted)).

K & F cites *Paddington Corp. v. Attiki Importers & Distributors, Inc.*, 996 F.2d 577, 586–87 (2d Cir.1993), in support of its assertion that secondary meaning may be presumed from evidence of intentional copying. *See Pl. Mem. Opp.* at 8. However, *Paddington* held that bad faith intentional copying may trigger a presumption of *likelihood of consumer confusion,* not a presumption of secondary meaning. As the Seventh Circuit has explained, this distinction is far from trivial:

> The state of mind of an alleged trademark infringer is more relevant to deciding whether consumers are likely to be confused than whether the trademark is valid; if the infringer thinks they will be confused that is some evidence that they will be. That question doesn't arise unless the trademark is valid.

*Blau Plumbing, Inc.*, 781 F.2d at 611 (citations omitted). K & F fails to offer any authority or justification for extending the more limited presumption suggested in *Paddington* to fashion a sweeping rule that intentional copying of another's product design automatically triggers a burden-shifting presumption that the design has acquired distinctiveness and therefore merits protection as trade dress under Lanham Act § 43(a).

Even if secondary meaning could be presumed from proof of intentional copying, K & F has failed to supply proof that Schwarz has copied anything other than an unprotectable marketing concept. In support of its claim of intentional copying, K & F presents evidence that (1) Schwarz had knowledge and possession of Amanda Love samples and some of K & F's product marketing and packaging materials before marketing Alluwishes, (2) the design of Amanda Love bears some resemblance to the design of Alluwishes; and (3) the concept of marketing the dolls as "wishing" dolls with a charity tie-in is identical. A reasonable factfinder could certainly conclude from this that Schwarz intentionally adopted K & F's idea of marketing an "angel" doll with a wishing theme and charitable donation. It is understandable, moreover, that K & F would resent what would reasonably appear to it as a large retailer's co-opting its apparently original and clever marketing strategy.

But the law does not prohibit copying of toy concepts or marketing devices. There is no evidence whatever that the German manufacturers of "Ambrosius" modeled their toy's design on Amanda Love, or even knew of her existence. There is, moreover, insufficient similarity between the appearances of the two dolls to give rise to any inference of copying of the actual design, still less to any likelihood that a consumer would confuse the two dolls, or assume that both came from the same source. What *can* be inferred is that Schwarz liked the idea of an angel doll that could be marketed with the idea of wishing and a connection to a children's charity, but thought that the idea would work better with a different or (economi-

cally or aesthetically) more desirable product. Schwarz did not copy the actual design of the product, but, at most, the notion of selling a (rather different) angel doll by using the themes of wishing and charity. No law prevents Schwarz from copying that idea, and no case supports the proposition that its decision to do so gives rise to an illogical inference that the notion has acquired a distinctive identification in the public mind with products manufactured by K & F.

2. Product Packaging Trade Dress

K & F fares no better with its claim based on Amanda Love's packaging. K & F asserts that its product packaging trade dress consists of the following particular elements:

> [1] its name including the word wish, as expressed on the packaging label; [2] a five-pointed gold star is juxtaposed to the name "the Original Wish Doll" on the package label. Gold stars are also utilized in [3] the K & F Wish Company Logo on all advertising, stationary business cards etc. The product is advertised, utilizing two formats: [4] a photograph of the doll is presented over a light blue sky with white clouds. [5] A brief description of wishing, and its significance, is found in the inside front cover of the brochure. In the lower left-hand corner of the cover of the brochure, and included in all the product packaging, marketing materials and press releases concerning the Original Wish Doll, is the disclosure that [6] the Plaintiff donates a portion of its sales proceeds money to the Make–A–Wish Foundation, an organization that helps children.... In the lower left corner [of the brochure] is [7] the slogan "MAY ALL YOUR WISHES COME TRUE!"

*Pl. Mem. Opp.* at 2–3. K & F cannot sustain its claim of "packaging" trade dress infringement in any literal sense, for Alluwishes, the allegedly infringing prod-

uct, is not actually sold in any "packaging." Instead, K & F alleges infringement of Amanda Love's packaging based on a combination of design and marketing features for Alluwishes that K & F claims infringes on the overall look and character of Amanda Love's packaging.

The packaging for Amanda Love may be protectable as trade dress under Lanham Act § 43 either if it is "inherently distinctive" or if it has acquired distinctiveness in the form of secondary meaning. *Wal–Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210–11, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000). Under Second Circuit precedent, packaging trade dress may be classified in one of five categories of increasing distinctiveness; under that schema, which was first set forth in the context of word marks, packaging trade dress may be either (1) "generic"; (2) "descriptive"; (3) "suggestive"; (4) "arbitrary"; or (5) "fanciful." *Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 164 F.3d 736, 743 (2d Cir.1998) (*"Nora Beverages I"*); *see also Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976) (Friendly, J.). "Suggestive," "arbitrary," or "fanciful" packaging trade dress is considered inherently distinctive and therefore protected under the Lanham Act; packaging trade dress that is "descriptive" may be protected only by establishing acquired distinctiveness or secondary meaning in the minds of the public. *Nora Beverages I*, 164 F.3d at 743. "Generic" trade dress is never entitled to protection. *Id.*

In this case, however, K & F does not offer evidence sufficient to create a genuine issue of fact as to distinctiveness, whether or inherent or acquired, of its packaging. All of the principal elements of K & F's asserted packaging trade dress—the use of the word "wish" and the slogan "MAY ALL YOUR WISHES

COME TRUE," the promotion of a charity tie-in, the attachment of a tag describing the theme of the doll, and the use of gold stars, blue sky, and clouds in the labeling and advertising of Amanda Love—are either generic or, at most, merely suggestive of the broader idea of the angelic, "wishing" character that both K & F and Schwarz are entitled to produce and market. *See Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 32–33 (2d Cir.1995) (trade dress law does not protect "an idea, a concept, or a generalized type of appearance," but only "the concrete expression of an idea" in that trade dress); *Haagen–Dazs, Inc. v. Frusen Gladje Ltd., A.B.*, 493 F.Supp. 73, 75 (S.D.N.Y.1980) (distinguishing between "attempt to trade off the good will of another and the legitimate imitation of an admittedly effective marketing technique"). While it is the "combination of elements that should be the focus of the distinctiveness inquiry," rather than any particular element or elements taken in isolation, "the fact that a trade dress is composed exclusively of commonly used or functional elements" supports the conclusion that the claimed trade dress is not inherently distinctive. *Id.* at 32. Here, there is nothing particularly distinctive about the overall appearance generated by the particular elements of Amanda Love's packaging.

Having failed to establish that its packaging trade dress is inherently distinctive, K & F only may obtain trade dress protec-tion under Lanham Act § 43(a) by demonstrating that its packaging has acquired secondary meaning. And as with its product design trade dress claim, K & F fails to advance more than a scintilla of evidence in support of that conclusion, again seeking refuge in its conclusory assertion that Schwarz bears the burden of rebutting a presumption of secondary meaning on account of its supposed copying of Amanda Love's packaging. As discussed above, no such presumption exists under Second Circuit precedent. *See, e.g., Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1042 (2d Cir.1992). The Court therefore concludes that no reasonable factfinder could find that K & F's packaging for Amanda Love is distinctive and therefore protectable as trade dress under the Lanham Act.

## B. *Likelihood of Confusion*

▪▪▪ Even if K & F could legitimately claim the protection of the Lanham Act for the product design or packaging trade dress for Amanda Love, summary judgment in favor of Schwarz would still be warranted, for K & F has failed to demonstrate any likelihood of confusion as to the source of Schwarz's product.[5] Likelihood of confusion is determined by considering the eight factors originally elaborated by the Second Circuit in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir.1961):(1) the strength

5. K & F bears the burden of demonstrating likelihood of confusion. As with its claims concerning the distinctiveness of its trade dress, K & F asserts that Schwarz bears the burden of proving the *absence* of any likelihood of confusion on account of its supposed intentional copying of Amanda Love's design and packaging. Again, K & F overstates the law. Proof of intentional copying, by itself, is not sufficient to shift the burden of proof to the defendant. Rather, a presumption of consumer confusion only arises "[w]here a second-comer *acts in bad faith* and intentionally copies ... trade dress" of the plaintiff. *Paddington*, 996 F.2d at 586 (emphasis added). As discussed above, K & F Wish has failed to prove any bad faith—in the sense of copying any protectable element or deliberately intending to create confusion about source or origin—on the part of Schwarz, and therefore retains the burden of proving likelihood of confusion. At any rate, this is not a close case, and the Court's conclusion that there is no triable issue of fact as to likelihood of confusion does not turn on the allocation of the burden of proof.

of the plaintiff's mark; (2) the degree of similarity between the marks; (3) the proximity of the products; (4) the likelihood that the plaintiff will bridge the gap between the two products; (5) actual confusion of customers in the relevant market; (6) the defendant's good faith in adopting its mark; (7) the quality of the defendants' product; and (8) the sophistication of the buyers. *Nora Beverages II,* 269 F.3d at 118. The Court must "focus on the ultimate question of whether consumers are likely to be confused," and while no single factor is *necessarily* dispositive, "any one factor may prove to be so." *Id.* While "[q]uestions regarding likelihood of confusion are normally factual in nature," summary judgment nevertheless "is appropriate if the court is satisfied that the products or marks are so dissimilar that no question of fact is presented." *Universal City Studios, Inc. v. Nintendo Co., Ltd.,* 746 F.2d 112, 116 (2d Cir.1984); *see Nabisco, Inc. v. Warner–Lambert Co.,* 220 F.3d 43, 46 (2d Cir.2000) ("in an appropriate case, the 'similarity of the marks' factor can be dispositive and will warrant summary judgment for an infringement defendant if ... [the] marks are so dissimilar that no question of fact is presented" (internal quotation marks omitted)); *Resource Developers, Inc. v. Statue of Liberty–Ellis Island Foundation, Inc.,* 926 F.2d 134, 141 (2d Cir.1991) (affirming summary judgment where marks "are so materially different that no question of fact was presented on the issue of likelihood of their confusion"). The Court may visually compare the marks in order to determine whether any material question of fact exists as to their similarity. *See*

*Resource Developers,* 926 F.2d at 141; *Universal City Studios,* 746 F.2d at 116.

█ Here, the "similarity of the marks" factor is dispositive, for the design and packaging of Alluwishes bears so little resemblance to that of Amanda Love that no reasonable factfinder could conclude that there is any likelihood of confusion between them. Amanda Love is designed as a rather conventional looking, non-plush doll—arguably angelic and apparently female, standing upright, with frizzy red hair, outstretched arms, and various objects (buttons, fabric roses, bows, hearts, and a pink ribbon) sewn to her triangular body in no particular pattern. Alluwishes, by contrast, is almost "cartoonish" in appearance—an angelic, bald, and apparently male plush toy, shaped in a seated position, with a large halo, large gold wings, a gown with several large gold stars, and prominent and oversized physical features, including large bare feet, floppy ears, and a big red nose. The product design is thus unlikely to cause any confusion, or suggest a common origin to the consumer. The "packaging" is even less likely to cause confusion—Alluwishes is not sold in *any* packaging,[6] and with one exception, the advertising materials for the two products bear little resemblance to each other: While both parties have advertised their products using a background of blue sky and clouds, those elements are often associated with depictions of angel-like characters, and it is unlikely that consumers would be confused based on that particular aspect of the advertising for Alluwishes.

The most that a reasonable juror could conclude is that each party has attempted to market a toy based on the common idea

---

**6.** As noted above, when ordered from the internet or a catalogue, Alluwishes is shipped in clear plastic wrapping of the same sort used in the packaging of Amanda Love. This factor, however, is irrelevant, since the mail-order packaging is not seen by the consumer

until after the doll is bought and shipped, and the perfectly generic, functional, unadorned clear wrapping can neither be considered a distinctive element of K & F's packaging nor cause any confusion as to origin.

or theme of an "angelic" character that may be used to make wishes, and to donate some portion of the sale proceeds to charity—but K & F is not entitled to any monopoly over that general idea. Nothing about the overall appearance of the design or "packaging" of Alluwishes is likely to confuse anyone into thinking that Alluwishes and Amanda Love share a common source.

## II. Unfair Competition

In addition to its claim under the Lanham Act, K & F asserts a common law claim for unfair competition. Under New York law, a claim for unfair competition rests on "the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods."

*Jeffrey Milstein*, 58 F.3d at 34 (internal quotation marks omitted). The plaintiff must prove that defendant acted in bad faith and either (1) actual confusion, in order to obtain damages, or (2) likelihood of confusion, in order to obtain equitable relief. *Id.* at 34–35. Since, as discussed above, K & F has failed to demonstrate either bad faith on the part of Schwarz or any likelihood of consumer confusion, K & F's unfair competition claim meets the same fate as its Lanham Act claim.

## CONCLUSION

For the foregoing reasons, the motion for summary judgment is GRANTED, and judgment will be entered for the defendant.

SO ORDERED:

APPENDIX